******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DUANE GROVENBURG ET AL. *v.* RUSTLE
MEADOW ASSOCIATES, LLC, ET AL.
(AC 37719)

DiPentima, C. J., and Prescott and Gold, Js.

*Argued January 18—officially released June 20, 2017*

(Appeal from Superior Court, judicial district of
Hartford, Hon. Richard M. Rittenband, judge trial
referee.)

*Barbara M. Schellenberg*, with whom was *Ari J. Hoff-
man*, for the appellants (defendants).

*Jared M. Alfin*, for the appellees (plaintiffs).

*Opinion*

DiPENTIMA, C. J. In this appeal, we address the contours of judicial review in cases in which a discretionary determination of a common interest ownership association is challenged. The defendants, Rustle Meadow Associates, LLC (company), Rustle Meadow Homeowners Association, Inc. (association), and its president, Jeffrey D. Miller, appeal from the judgment of the trial court in favor of the plaintiffs, Duane Grovenburg and Kristine Grovenburg. The defendants' principal contention is that the court improperly set aside the association's discretionary determination regarding the plaintiffs' request to erect a fence on their property. Specifically, they claim that the court failed to apply the proper legal standard governing review of such determinations, as established by our Supreme Court in *Weldy* v. *Northbrook Condominium Assn., Inc.*, 279 Conn. 728, 904 A.2d 188 (2006). The defendants also claim that the court improperly rejected the substance of their counterclaim, that it improperly invalidated a special assessment levied by the association, and that it abused its discretion in awarding the plaintiffs $72,718.25 in attorney's fees. We affirm in part and reverse in part the judgment of the trial court.

The relevant facts are gleaned from the court's memorandum of decision and the undisputed evidence in the record before us. Rustle Meadow is a planned community[1] created pursuant to the Common Interest Ownership Act (act), General Statutes § 47-200 et seq.[2] Consistent with the strictures of that act, the Declaration of Rustle Meadow (declaration) was recorded on the Canton land records in January, 2006. See General Statutes § 47-220 (a) (common interest community may be created "only by recording a declaration executed in the same manner as a deed"); *Peck* v. *Milford Hunt Homeowners Assn., Inc.*, 110 Conn. App. 88, 95, 953 A.2d 951 (2008) ("a common interest community does not come into existence until the declaration is filed in the land records"). The company is identified as the declarant in that document.

Approval of the development of Rustle Meadow by the Canton Planning Commission was conditioned on, inter alia, the dedication of an eight acre portion of the property to "open space." In accordance therewith, the company granted "a perpetual conservation restriction and easement" (conservation easement) to the town of Canton. Among the covenants agreed to by the company were that "the [c]onservation [a]rea shall be maintained in its present condition, and no topographic changes shall be made," and that "there shall be no removal, destruction or cutting of trees, shrubs or plants" in the conservation area. That conservation easement is memorialized in both the "Description of Land Being Declared" and an A-2 survey appended to the declaration (declaration survey).[3]

Rustle Meadow is described in the public offering statement[4] admitted into evidence as a "common interest equestrian community" that features "the use of a premier barn, outdoor arena, indoor arena (if built), acres of pasture, acres of open space, a gorgeous stream, and walking and riding trails . . . ." Miller is the sole member of the company, which developed Rustle Meadow, and has remained the owner of five of its seven units. Rustle Meadow is governed by the association, upon which the declaration confers various powers and responsibilities.[5] The association, in turn, acts through its executive board (board), as recognized in both the declaration and the association's bylaws. At all relevant times, the board was comprised of Miller, his wife, Linda Welles, and his sister, Pam Claywell.[6]

Welles owns one unit in Rustle Meadow, known as "Unit 4," where she and Miller reside. On August 11, 2006, the plaintiffs purchased an abutting property, which the statutory warranty deed (deed) describes as "Unit No. 3 of Rustle Meadow." That deed provides in relevant part that "[s]aid real property is conveyed together with and subject to the terms, conditions, agreements, obligations and easements contained in the [d]eclaration . . . . The [g]rantee, by acceptance of this deed, agrees to become a member of [the association] and to abide by the Certificate of Incorporation, Bylaws, Rules and other regulations of the [a]ssociation." Section 21.1 of Article XXI of the declaration likewise provides that "[t]he acceptance of a deed or the exercise of any incident of ownership . . . of a Unit constitutes agreement that the provisions of the Documents are accepted and ratified by such Unit Owner . . . and all such provisions recorded on the Land Records of the Town of Canton are covenants running with the land and shall bind any Persons having at any time any interest or estate in such Unit." At trial, the plaintiffs testified that they reviewed the declaration individually and with their attorney prior to purchasing the property, and were aware of the restrictive covenants contained therein.[7]

Various exhibits admitted into evidence, including the declaration survey, indicate that the plaintiffs' unit is 1.76 acres in size and narrow in shape.[8] Their unit is bordered to the west by land designated as "Open Space" and subject to the conservation easement. Those exhibits also indicate that a northeasterly portion of the plaintiffs' parcel is subject to a "pasture easement"[9] for which development rights to create common elements of Rustle Meadow were reserved by the company.[10]

Article X of the declaration sets forth various restrictions on the units in Rustle Meadow. Pertinent to this appeal is § 10.1 (k). Titled "Approval of Building and Landscaping Plans," it provides in relevant part: "No building, shed, swimming pool, pavement, fence, wall

or other structure or improvement of any nature shall be erected upon any Unit in the Common Interest Community without the prior written consent of the Declarant . . . . No Unit Owner shall make any exterior addition, change or alteration to a Unit or any residence located therein . . . or substantially change the topography of a Unit including the removal of any trees without the prior written consent of the Declarant which consent shall not be unreasonably withheld. Detailed plans of any such construction or landscaping or any addition, change or alteration thereto shall be submitted to the Declarant . . . . The Unit Owner must receive written approval from the Declarant prior to commencing such construction, landscaping or making any additions, changes or alterations. Any unauthorized construction or changes must be restored to its previous condition at such Unit Owner's expense." Section 13.1 (a) (ii) of Article XIII, which addresses "Additions, Alterations and Improvements by Unit Owners," similarly provides in relevant part that a unit owner "[m]ay not make any changes, additions, alterations, or improvements to any structure in or on any Unit . . . or make any substantial change to the topography of a Unit . . . including the removal of trees, without the prior written approval . . . as provided in Section 10.1 (k) of this Declaration . . . . Such approval by . . . the [a]ssociation shall not be unreasonably withheld."

During construction of their residence, the plaintiffs requested approval to install an in-ground swimming pool on their property.[11] The declarant granted that request, and the pool was completed in the fall of 2008. An "as-built" survey, which was admitted into evidence, indicates that the pool is located behind the plaintiffs' residence to the south. At its closest point, the pool measures 24.2 feet from the southeasterly side yard property line.

In December, 2009, the plaintiffs received written notice from the Canton building official that "[t]he pool is in violation because it is not properly fenced as required by [the] Connecticut State Building Code." The plaintiffs thereafter submitted to Miller a written proposal to install a fence around the pool.[12] The fencing proposed by the plaintiffs would border "Unit 2" to the southeast, and not Welles' "Unit 4" property to the northwest. In that June 23, 2010 e-mail, the plaintiffs invoked §§ 10.1 (k) and 13.1 (a) (ii), stating that "[a]pproval is expected as soon as possible and per the [declaration] 'shall not be unreasonably withheld.' " They further advised that "any problems, issues, etc. should be submitted to our attorney with a copy to us. He will then contact your legal counsel to resolve." Miller responded two days later on behalf of the association and requested further information on the proposal.[13] Hours later, the plaintiffs sent Miller another e-mail, in which they largely disagreed with the need for further information. In that communication, the

plaintiffs also asked Miller to "provide us with the appropriate sections in the declaration, [association] rules, or our lot purchase agreement [and] the exact sections that define the green zone." See footnote 13 of this opinion.

On July 2, 2010, Miller again responded to the plaintiffs via e-mail and elaborated on his request for further information. In particular, he stated that "[t]he reason for the scale drawing is to ascertain where the fence is on the property, most importantly in relation to the green zone. Markings on the ground are not sufficient as they can be erased or damaged in the construction process. Then there is no way to agree post construction on where the fence should have been installed. Accurate measurements from known immovable points are needed, and then the approved location is well known and reproducible." With respect to the plaintiffs' query about the "green zone," Miller stated that "[§] 10.1 (k) of the declaration is very clear on landscaping changes requiring approval. The green zone has been established by the association, and was discussed with you prior to purchasing [Unit 3] and clearing the lot. All of the trees cut on both sides of the house . . . are those that were outside of the green zone, all the trees and shrubs inside the green zone were not cut. Numerous discussions took place where you acknowledged the green zone. The green zone falls within the authority of the board in approving landscape changes after construction. The 'green zone' is simply a term which names a section of the land adjacent to the wooded property lines where the association will tightly regulate any landscape changes to maximize the visual buffer between adjacent lots. You have already done unapproved landscaping on your unit that affects this visual buffer. Any landscaping approval by the board will include consideration of maintaining the integrity of the green zone." In a subsequent e-mail sent ten days later, Miller advised the plaintiffs that "[t]he pool fence will most likely not be approved any closer than fifteen feet to the property line. Maintaining a visual buffer between lots in this community is a reasonable criteri[on] from which to make a decision . . . . The language in [§] 10.1 [k] says 'consent shall not be unreasonably withheld'. A visual buffer is a common community practice, is seen as an asset to a community, and is widely used by both town planning commissions and common interest communities. The board feels this is an entirely reasonable criteri[on] on which to base landscaping decisions."

Days later, the plaintiffs submitted certain revisions to their fence proposal that included a brochure of the proposed fence material and a drawing with what they termed "clear permanent points of measurement" for the fence's proposed location. That drawing indicated that the fence would be 8.5 feet from the southeasterly property line, which borders "Unit 2" of Rustle Meadow.

In their correspondence, the plaintiffs also stated that "[t]he [d]eclaration, lot purchase agreement, construction contract, all of the written agreements we have for our home do not mention or stipulate a 'green zone' or a '[fifteen] foot' requirement or any other foot requirement. Therefore they are not relevant to the approval of the type of fence we have requested to install. We have a property line which is noted on the drawing. Any requirement to a 'green zone' that does not exist in the lot plans or declaration is inappropriate and unreasonable." They further indicated that the proposed fence complied with town regulations. The plaintiffs then requested a decision on their proposal in writing by the board.

Miller furnished the decision of the board in a July 23, 2010 e-mail to the plaintiffs. In that decision, Miller reiterated that "a proper scale drawing is needed." He then stated that "[a]s the proposed fence appears to fall well within the [fifteen] foot visual buffer we call the green zone . . . the fence as drawn is not approved. . . . The board would likely approve a black Echelon fence that is on or adjacent to the patio edge (on the east side), and encourages you to submit a drawing proposing that. . . . If you prefer to locate the fence as close to the [g]reen [z]one line as possible, the board will require a fence maintenance plan for any section of fence that lies within [three] feet of the green zone, or within [eighteen] feet of the property line. . . . In addition, if the proposed fence is within 1.5 feet of the green zone the board will require that the line be surveyed, as the flagging currently in use is only an approximation. Whether or not you can find the term 'green zone' in the declaration does not affect the authority of the board to determine what are acceptable landscaping changes to take place in the community. Authority comes from [§] 10.1 (k) of the declaration that outlines the landscape review process. . . . The [fifteen] foot visual buffer green zone is something that is already in place, and was previously acknowledged by you. The board has every intention of keeping it in place. Continuing to state that the board's landscaping review criteria are inappropriate and quoting town zoning [requirements are] not responsive to the board's request. The town's requirements are in addition to, but are not the only requirements in a planned community like Rustle Meadow. Please submit a pool fence construction plan and an accurate scale drawing that adequately respects the [fifteen] foot visual buffer green zone if you would like it to be considered."

Sixteen months later, Miller sent the plaintiffs an e-mail dated December 2, 2011, in which he noted that it had "been months since we heard from [you] on submitting a suitable location for the pool fence" and cautioned that "[t]he association can no longer tolerate this safety risk, and will be writing a letter to the town asking for enforcement." Miller subsequently contacted

the Canton building department and informed it that "[t]here has been no pool fence" on the plaintiffs' property "since the pool was completed in 2008." Miller also stated that fencing previously proposed to the association by the plaintiffs "placed the fence unnecessarily within a [fifteen] foot visual buffer zone along the property line. The board denied the fence location on that basis, and encouraged a fence proposal that was outside of the [fifteen] foot buffer. . . . The entire summer and fall of 2011 has passed with no new proposal. . . . [A] temporary garden wire type fence has been put up. While this is better than nothing, the board is concerned that this dangerous situation is not being rectified . . . . While we understand winter weather might not allow an immediate correction, we would hope that an acceptable plan could be submitted to this board before spring, and construction could begin when weather allows." The building department thereafter sent the plaintiffs a certified letter that requested "[y]our compliance in addressing this serious violation . . . ."

In the spring of 2012, Attorney Louis N. George submitted a revised fence proposal on behalf of the plaintiffs. That submission states in relevant part: "Attached are the plans for the fence and where it will be located. Town regulations allow the fence to be placed at the boundary line. There are no [a]ssociation regulations limiting the location of the fence. Our clients are, however, intending to place the fence approximately eight feet from the boundary. Hopefully you will embrace this compromise. The fence design is one that you had already stated would be fine. Please let us know if this is acceptable." Included in that submission was an updated depiction of the proposed fence location, which the plaintiffs sketched onto a copy of the "as-built" survey of the pool. In the eight foot section between the proposed fence and the southeasterly property line, the plaintiffs indicated that "[b]amboo type shrubs to be placed every [six-eight] feet . . . . Nursery indicated this type of shrub would grow in this wet, shaded area. These shrubs along with existing vegetation on side yard will provide more than sufficient coverage." In response, the board requested "details regarding the species and mature height of the bamboo and a scale drawing of the plan . . . ." Several months passed as discussions continued between the parties.

At the time of the association's June 21, 2013 annual meeting, both the plaintiffs and the association were represented by legal counsel. The minutes of that meeting state in relevant part that "[d]iscussion was held regarding the visual buffer area between units that the board calls the green zone. The [plaintiffs] stated that there is no specific boundary in the documents to restrict activity. [Miller] stated that the [plaintiffs] had acknowledged in writing the need to maintain a visual green zone buffer between units for privacy and to maintain the wooded character of the community. The

board noted that the standard buffer is [twenty feet] but that the [plaintiffs] were given a concession for [fifteen feet] because they have the narrowest lot." The minutes reflect that the plaintiffs had submitted a revised pool fence proposal, but had not yet responded to the board's request for additional information. The minutes further indicate that the plaintiffs "agreed to provide the details on the pool fence plantings requested by the board and to submit a proposal for creation of an undisturbed visual buffer area," which the board "agreed to review . . . when provided and respond within [two] weeks."

By letter dated July 9, 2013, George responded to the board's request for further information on behalf of the plaintiffs. With respect to the proposed plantings, George stated that "Scabrida Clumping Bamboo" would be installed "between the side yard fencing and the property line on the [southwesterly] side of the house with the vacant lot, as noted on the drawing." He also explained that "[t]he bamboo grows [twelve-fourteen feet] tall by [three feet] wide for each bush" and that this species "is non-invasive, vigorous and easy to grow . . . ." As to the buffer area between Units 3 and 4, George indicated that the plaintiffs "would be glad to agree to continue adding shrubs and ground cover to this area in the future." Months passed without any formal response or action by the board. Nevertheless, discussions between the parties' respective attorneys continued in an attempt to reach an agreement. It is undisputed that, at some point in the fall of 2013, counsel for the association withdrew his representation due to a personal matter.

The plaintiffs commenced this civil action in December, 2013. At that time, the association had not rendered a decision on the plaintiffs' pending proposal.[14] The operative complaint dated April 17, 2014, contains three counts. The first count set forth a cause of action under the act; see General Statutes § 47-278 (a);[15] and alleged, inter alia, that the defendants "failed to approve [the fence proposal] even though all the requirements were met" and "unreasonably" denied that proposal and "conditioned the Association's approval of the fence on . . . compliance with the fictional Green Zone." The first count also alleged that the defendants improperly issued certain fines against the plaintiffs "for violating a fifteen (15) foot visual buffer area between [their] property and Miller's home (the 'Green Zone')." The second count alleged a breach of fiduciary duty on the part of the defendants. The third and final count sought the appointment of a receiver for the association pursuant to General Statutes § 52-504.[16]

In their prayer for relief, the plaintiffs sought "[1] monetary damages; [2] interest; [3] costs of suit; [4] appointment of a receiver to manage and operate the [a]ssociation as a matter of equity pursuant to [§] 52-

504; [5] an injunction prohibiting [Miller] from assigning his rights or powers as the owner of [the company] or as the president of the association to his wife, heirs, successors, assigns and/or family members [from] holding a position on the [board] or participating in any voting concerning the association, as well as any and all relief requested in [the plaintiffs'] application for an injunction, which is incorporated herein by reference;[17] [6] an injunction ordering the association to permit the plaintiffs to erect a fence around their swimming pool in accordance with the Town of Canton's rules and/or regulations; [7] an order that there is no 'Green Zone' as defined by [the defendants] at [Rustle Meadow] and/ or that applies to the plaintiffs' property at [Rustle Meadow]; [8] an order that all statutory liens arising from fines and/or penalties assessed against the plaintiffs by the association from the beginning of time to date are removed, discharged and declared null and void; [9] attorney's fees and costs pursuant to [§] 47-278 (a); and [10] any and all other relief, legal or equitable, that the court deems just and proper." (Footnote added.)

The defendants thereafter filed both an answer and a counterclaim. In that counterclaim, the defendants sought recourse related to (1) certain unpaid assessments levied against units in Rustle Meadow; (2) fines imposed by the association for unauthorized landscaping allegedly performed by the plaintiffs; and (3) fines imposed by the association against the plaintiffs due to their alleged interference with a boundary marker. In answering that counterclaim, the plaintiffs either denied its allegations or claimed that they lacked sufficient knowledge and therefore left the defendants to their burden of proof.

During a pretrial deposition, portions of which were admitted into evidence at trial, the plaintiffs' counsel asked Miller to define the "green zone." Miller stated that "[i]t's a visual buffer that is one of the standards that the association uses to evaluate changes to landscaping . . . in the conduct of its business of the subdivision." When counsel requested a more detailed explanation of that "buffer," Miller stated that "[i]t's an area where natural vegetation would be protected and not removed, destroyed, cut, or in other ways inhibited so as to provide a visual buffer between adjoining building lots." Miller further confirmed that "[t]here are no documents recorded at the [Canton] town hall that contain the phrase, the Green Zone."

A court trial was held in November, 2014. One day before trial was to begin, the plaintiffs filed a motion in limine seeking to preclude any testimony or documentation relating to the green zone, arguing that because the term "green zone" is not contained in either the declaration or any other material recorded on the Canton land records, it is "is clearly unenforceable"

under the act. The trial court agreed, stating that "it doesn't seem . . . that it's reasonable if it is not in writing. . . . I'm granting the motion in limine because I don't think that the so-called green zone, being unwritten, is . . . sufficient notice to the prospective buyer."

Trial proceeded over three days, during which the court heard testimony from the plaintiffs, Miller, and Welles. Following the close of evidence, the court held a hearing on the issue of attorney's fees, at which the plaintiffs represented that they had incurred $47,420.33 in such expenses.

In its January 14, 2015 memorandum of decision, the court reiterated its previous finding, made while ruling on the motion in limine, that the "green zone is not reasonable because it was not in writing . . . . [T]here is nothing in writing in the declaration or bylaws to indicate to anyone, including the plaintiffs, that there is a green zone . . . . Accordingly, this court finds that it was illegal and inequitable for the association to deny the applications for a fence around the pool in the [green zone]." (Citation omitted.) The court then proceeded to rule in favor of the plaintiffs on all counts of the defendants' counterclaim. At the same time, the court ruled in favor of the defendants on the plaintiffs' request for the appointment of a receiver for the association.

The court then issued six specific orders. First, it ordered "[a] temporary injunction . . . that the association permit the plaintiffs to erect a fence around their swimming pool in accordance with the town of Canton's rules and/or regulations, whether in the green zone or not. Further, the defendants are prohibited from interfering with the plaintiffs' use of the 'green zone,' whether the plaintiffs remove, replace, alter or add trees and foliage. The green zone is, after all, the plaintiffs' property. The defendants are ordered to cooperate with the plaintiffs in case a variance is needed or any other action is needed by them to accomplish the erection of the fence around the swimming pool as desired by the plaintiffs. [Second] the defendants are ordered to remove, immediately, any liens that have been placed against the plaintiffs' property for fines/assessments. [Third] a temporary injunction is issued prohibiting Miller from assigning his rights or powers as the owner of the subdivision or as the president of the association to his wife, heirs, successors, assigns and/or family members [from] holding a position on the board of the association as well as any and all relief requested in [the] plaintiffs' application for an injunction except for arms-length sales of individual lots, and their request for a receiver. [Fourth] the green zone as defined by the defendants as it applies to the plaintiffs' property at the development is hereby declared null and void. [Fifth] all parties are prohibited from disparaging or criticizing each other to others, including, but not limited to, possible buyers of lots in the subdivision. [Sixth,

the defendants'] counterclaim [is] hereby rejected. The defendants' request for attorney's fees is denied."

Last, the court rendered an award of attorney's fees in favor of the plaintiffs in the amount of $57,718.25. The defendants subsequently filed a "motion to reargue and reconsider memorandum of decision" and a "motion for articulation and rectification," both of which the court summarily denied. The defendants commenced this appeal on February 23, 2015.

Days later, the defendants filed a motion requesting a stay of the injunctive relief ordered by the court pending resolution of this appeal. On March 27, 2015, the trial court issued the following order: "Denied. With the exception that, for clarification purposes, Jeffrey Miller, Linda Welles, Pam Claywell and unit owners may serve on the board of directors of the association. The court finds that the balance of the equities is in favor of the plaintiffs. Under [Practice Book §] 61-12, there is little likelihood that the [defendants] will prevail because it is well settled law that temporary injunctions are not appealable.[18] There is no irreparable harm to be suffered by the defendants upon immediate implementation of the judgment. As for the automatic stay provided during an appeal, this court, sua sponte, hereby terminates that stay." (Footnote added.) That same day, the court granted the plaintiffs' application for a prejudgment remedy in the amount of $72,718.25.[19]

On March 24, 2015, the plaintiffs filed in the trial court a motion for contempt, claiming, inter alia, that the defendants had continued to impose assessments on the plaintiffs' unit. In its April 6, 2015 order, the court stated that "[t]he motion for contempt is denied on the basis that [the defendants' counsel] has represented that no liens have been filed . . . ." The court nonetheless ordered that "[t]he association is to remove any assessment against the plaintiffs for legal fees related to this case and any legal fees from here on in related to this case, which the court declares said fees to be null and void. . . . The termination of the automatic stay remains in place, except that the plaintiffs may not execute on the prejudgment remedy or its substitution while the appeal is pending." On April 24, 2015, the defendants filed an amended appeal with this court to encompass those additional rulings.

On May 13, 2015, this court granted a motion for review filed by the defendants with respect to the trial court's denial of a stay of injunctive relief and sua sponte termination of the automatic stay. This court vacated those orders, specifically determining that the trial court's judgment awarding injunctive relief was permanent in nature and, thus, appealable. This court therefore remanded the matter to the trial court with direction to (1) consider whether a stay of such relief should be imposed in this case under General Statutes § 52-477[20] and (2) to reconsider whether the automatic

stay should be terminated pursuant to Practice Book § 61-11.

On June 25, 2015, the trial court issued an order in response thereto. In that order, the court reiterated that the "green zone" was not in writing. It then found that "the due administration of justice requires an order that the stay be terminated because it is unlikely that the [defendants] will prevail in view of the fact that the 'green zone' is illegal." The court thus terminated the stay "to the extent that the plaintiffs may install a permanent fence surrounding the swimming pool within the 'green zone,' but shall use their best efforts not to interfere with shrubbery and trees. . . . For the same reasons, the 'green zone' being illegal, the stay is terminated as to the fines imposed by the defendants because of alleged violation of said 'green zone.' The court granted a prejudgment remedy on behalf of the plaintiffs, but no attachment or garnishment should be made because the parties have agreed to a certificate of deposit to be held in escrow, which will cover the prejudgment remedy." The defendants then filed a further motion for review with this court regarding that order. This court granted review of that motion, but denied the relief requested.

I

The principal issue in this appeal is whether the trial court applied the proper legal standard governing judicial review of the discretionary determinations of an association in a common interest community, or whether, as the defendants contend, its decision constituted a "gross departure" from that standard. In answering that question, we note that this is an emerging area of the law that has received relatively little treatment by the appellate courts of this state. We begin, therefore, with an overview of the development of common interest community jurisprudence.

A

Background

"Although common-interest communities date back into the 19th century, they have become a widely available form of housing only since the 1960s." 2 Restatement (Third), Property, Servitudes § 6.13, comment (b), p. 239 (2000); accord *Cape May Harbor Village & Yacht Club Assn., Inc.* v. *Sbraga*, 421 N.J. Super. 56, 69, 22 A.3d 158 (App. 2011) ("[c]ommon interest developments are a relatively recent phenomenon, but . . . have rapidly grown in the United States"). As noted by many commentators, "[a] large and growing portion of the housing stock of America is located in common interest communities governed by owner associations." (Footnote omitted.) S. French, "Making Common Interest Communities Work: The Next Step," 37 Urb. Law. 359, 359 (2005); see also E. Lombardo, "A Better *Twin Rivers*: A Revised Approach to State Action by Com-

mon-Interest Communities," 57 Cath. U. L. Rev. 1151, 1151 (2008) ("[n]early fifty-nine million Americans live in private common-interest communities, governed by member-elected governing boards or associations"); A. Arabian, "Condos, Cats, and CC&Rs: Invasion of the Castle Common," 23 Pepp. L. Rev. 1, 24 (1995) ("[c]ommon interest developments are the fastest growing form of housing in the United States").

As our Supreme Court has explained, the act "contemplates the voluntary participation of the owners" within a common interest community. *Wilcox* v. *Willard Shopping Center Associates*, 208 Conn. 318, 326, 544 A.2d 1207 (1988). In purchasing units in a common interest community, owners forfeit certain liberties with respect to the use of their property by voluntarily consenting to restrictions imposed thereon, as specified in the declaration of the community. See, e.g., *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 738 (unit owners in common interest community give up degree of freedom they otherwise would enjoy in separate privately owned property); *Villas West II of Willowridge Homeowners Assn., Inc.* v. *McGlothin*, 885 N.E.2d 1274, 1278–79 (Ind. 2008) ("Restrictive covenants are used to maintain or enhance the value of land by reciprocal undertakings that restrain or regulate groups of properties. . . . Property owners who purchase their properties subject to such restrictions give up a certain degree of individual freedom in exchange for the protections from living in a community of reciprocal undertakings." [Citation omitted.]), cert. denied sub nom. *Ashcraft* v. *Villas West II of Willowridge Homeowners Assn., Inc.*, 555 U.S. 1213, 129 S. Ct. 1527, 173 L. Ed. 2d 657 (2009); *Levandusky* v. *One Fifth Avenue Apartment Corp.*, 75 N.Y.2d 530, 536, 553 N.E.2d 1317, 554 N.Y.S.2d 807 (1990) (purchase of unit in common interest community "represents a voluntary choice to cede certain of the privileges of single ownership to a governing body"); 1 Restatement (Third), Property, Servitudes § 3.1, comment (i), p. 364 (2000) ("policies favoring freedom of contract, freedom to dispose of one's property, and protection of legitimate-expectation interests nearly always weigh in favor of the validity of voluntarily created servitudes").

"Historically, restrictive covenants have been used to assure uniformity of development and use of a residential area to give the owners of lots within such an area some degree of environmental stability." *Montoya* v. *Barreras*, 81 N.M. 749, 751, 473 P.2d 363 (1970). As the Supreme Court of California noted, "[u]se restrictions are an inherent part of any common interest development and are crucial to the stable, planned environment of any shared ownership arrangement. . . . [S]ubordination of individual property rights to the collective judgment of the owners association together with restrictions on the use of real property comprise the chief attributes of owning property in a common

interest development." (Citations omitted.) *Nahrstedt* v. *Lakeside Village Condominium Assn.*, 8 Cal. 4th 361, 372–74, 878 P.2d 1275, 33 Cal. Rptr. 2d 63 (1994).

Owners of units in a common interest community, in turn, secure the right to enforce those restrictions against others.[21] See General Statutes § 47-278; *Bella Vista Condominium Assn., Inc.* v. *Byars*, 102 Conn. App. 245, 254, 925 A.2d 365 (2007) (owner has "a cause of action against the declarant or others who are subject to the provisions of the act when such parties violate the terms of either the act or the particular association's declaration or bylaws"); cf. *Mannweiler* v. *LaFlamme*, 46 Conn. App. 525, 535–36, 700 A.2d 57 (discussing right of owners to enforce restrictions in light of presumption that "each purchaser has paid a premium for the property in reliance on the uniform development plan being carried out"), cert. denied, 243 Conn. 934, 702 A.2d 641 (1997); *Rhue* v. *Cheyenne Homes, Inc.*, 168 Colo. 6, 8, 449 P.2d 361 (1969) ("[i]t is no secret that housing today is developed by subdividers who, through the use of restrictive covenants, guarantee to the purchaser that his house will be protected against adjacent construction which will impair its value, and that a general plan of construction will be followed"); *Lake at Twelve Oaks Homes Assn., Inc.* v. *Hausman*, 488 S.W.3d 190, 198 (Mo. App. 2016) (restrictions in "the [a]ssociation's [d]eclarations were adopted for the purposes of enhancing and protecting the value, desirability, and attractiveness of the subdivision").

At first blush, the inherently restrictive nature of a common interest community may appear to conflict with public policy favoring the free and unrestricted use of real property, which "was dominant in the United States throughout the nineteenth century . . . ." *Pertzsch* v. *Upper Oconomowoc Lake Assn.*, 248 Wis. 2d 219, 232, 635 N.W.2d 829 (App. 2001) (Anderson, J., concurring); cf. *Easterbrook* v. *Hebrew Ladies Orphan Society*, 85 Conn. 289, 296, 82 A. 561 (1912) (restrictive covenants narrowly construed "being in derogation of the common-law right to use land for all lawful purposes"). Nevertheless, the proliferation of common interest communities in the past half century has led courts to reconsider certain presumptions regarding covenants utilized therein. As the Supreme Court of New Hampshire noted four decades ago, "[t]he former prejudice against restrictive covenants which led courts to strictly construe them is yielding to a gradual recognition that they are valuable land use planning devices." *Joslin* v. *Pine River Development Corp.*, 116 N.H. 814, 816, 367 A.2d 599 (1976). That court further stated that "private land use restrictions have been particularly important in the twentieth century when the value of property often depends in large measure upon maintaining the character of the neighborhood in which it is situated." (Internal quotation marks omitted.) Id., 817. As the Supreme Court of Washington put it, "[t]he

premise that protective covenants restrict the alienation of land and, therefore, should be strictly construed may not be correct. Subdivision covenants tend to enhance, not inhibit, the efficient use of land. . . . In the subdivision context, the premise [that covenants prevent land from moving to its most efficient use] generally is not valid." (Emphasis omitted; internal quotation marks omitted.) *Riss* v. *Angel*, 131 Wn. 2d 612, 622, 934 P.2d 669 (1997). That court thus concluded that, in cases involving a dispute "among homeowners in a [common interest community] governed by the restrictive covenants, rules of strict construction against the grantor or in favor of the free use of land are inapplicable." Id., 623; see also *Lake at Twelve Oaks Homes Assn., Inc.* v. *Hausman*, supra, 488 S.W.3d 195 ("the right of one property owner to the protection of a restrictive covenant is a property right just as inviolable as is the right of others to the free use of their property when unrestricted"). Likewise, the Restatement (Third) of Property, Servitudes, promulgated in 1998, expressly eschews the public policy favoring the free use of land in this context.[22]

In reviewing the determinations of an association in a common interest community, Connecticut, like most jurisdictions, draws a crucial distinction between the *authority* to exercise the rights and responsibilities delineated in a declaration; see *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, 273 Conn. 724, 734, 873 A.2d 898 (2005); and the *propriety* of an association's exercise thereof. See *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 734; accord *Tierra Ranchos Homeowners Assn.* v. *Kitchukov*, 216 Ariz. 195, 199, 165 P.3d 173 (App. 2007) (distinguishing between "a case involving the interpretation of restrictive covenants" and "a case involving a challenge to [a] discretionary decision" [emphasis omitted]); *Felix Felicis, LLC* v. *Riva Ridge Owners Assn.*, 375 P.3d 769, 775 (Wyo. 2016) (distinguishing between questions "about the meaning of the covenants" and "the question [of] whether the associations reasonably applied them" [emphasis omitted]).

With respect to the former, principles of contract interpretation control. It is well established that the declaration is the constitution of a community organized pursuant to the act. *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 737; see also 2 Restatement (Third), Property, Servitudes § 6.12, comment (a), p. 226 (2000) (declaration is "the foundational document setting the parameters of the community's authority"); 8 Powell on Real Property (M. Wolf ed., 2000) § 54A.01 [11] [a], p. 47 ("[t]he declaration is the constitution for the community"). A declaration "operates in the nature of a contract, in that it establishes the parties' rights and obligations . . . ." *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, supra, 273 Conn. 734; see also *Harbour*

*Pointe, LLC* v. *Harbour Landing Condominium Assn., Inc.*, 300 Conn. 254, 259, 14 A.3d 284 (2011). Accordingly, rules of contract construction govern the interpretation of declaration provisions. *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC*, supra, 734–35. No deference to the association, therefore, is warranted on the issue of association authority under a declaration. See *Southeastern Connecticut Regional Resources Recovery Authority* v. *Dept. of Public Utility Control*, 244 Conn. 280, 289–90, 709 A.2d 549 (1998).

On the other hand, as to the exercise of an association's discretionary authority under a declaration, courts across the country agree that a degree of deference is warranted. As the Supreme Court of California recognized decades ago, "[g]enerally, courts will uphold decisions made by the governing board of an owners association so long as they represent good faith efforts to further the purposes of the common interest development, are consistent with the development's governing documents, and comply with public policy." *Nahrstedt* v. *Lakeside Village Condominium Assn.*, supra, 8 Cal. 4th 374; see also *McNamee* v. *Bishop Trust Co., Ltd.*, 62 Haw. 397, 407, 616 P.2d 205 (1980) ("[a]s long as the [association's] decision was reasonable and in good faith it will be upheld"); *Melson* v. *Guilfoy*, 595 S.W.2d 404, 407 (Mo. App. 1980) (finding "no abuse of discretion" in discretionary determination to "approve or disapprove a fence"); *Levandusky* v. *One Fifth Avenue Apartment Corp.*, supra, 75 N.Y.2d 538 ("[s]o long as the board acts for the purposes of the [common interest community], within the scope of its authority and in good faith, courts will not substitute their judgment for the board's"); 2 Restatement (Third), Property, Servitudes § 6.9, comment (d), pp. 173–74 (2000) ("[a]s the legitimacy and utility of design controls have become more widely accepted, courts have tended to increase the amount of deference they give to decisions reached by architectural-control committees or other design control authorities").

There are innumerable cases like the one now before us, in which a dispute arose over restrictive covenants that required association approval prior to construction on, or the alteration of, a unit in a common interest community. As the Supreme Court of Hawaii observed, "[c]ovenants requiring submission of plans and prior consent before construction . . . are commonly found in leases and deeds around the country. Most courts have found these approval clauses to be valid and enforceable as long as the authority to consent or approve is exercised reasonably and in good faith." *McNamee* v. *Bishop Trust Co., Ltd.*, supra, 62 Haw. 402–403; see also *Gleneagle Civic Assn.* v. *Hardin*, 205 P.3d 462, 469 (Colo. App. 2008) ("[t]he majority view with respect to covenants requiring submission of plans and prior consent to construction by the developer . . .

is that such clauses, even if vesting the approving authority with broad discretionary powers, are valid and enforceable so long as the authority to consent is exercised reasonably and in good faith" [internal quotation marks omitted]).[23]

More specifically, "[m]ost jurisdictions . . . recognize the validity and, in a proper case, the enforceability of covenants requiring consent to construction or approval of plans even if those covenants do not contain explicit standards for approval." *Cypress Gardens, Ltd.* v. *Platt*, 124 N.M. 472, 477, 952 P.2d 467 (App. 1997); accord *Dodge* v. *Carauna*, 127 Wis. 2d 62, 66, 377 N.W.2d 208 (App. 1985) ("[t]he result in jurisdictions that have considered covenants lacking objective standards of approval is generally consistent"). An association's exercise of its "broad latitude in making aesthetic decisions with respect to every type of improvement on the property"; *Buick* v. *Highland Meadow Estates at Castle Peak Ranch, Inc.*, 21 P.3d 860, 863 (Colo. 2001) (en banc); nevertheless remains subject to a general standard of reasonableness. See, e.g., *Rhue* v. *Cheyenne Homes, Inc.*, supra, 168 Colo. 9 ("a refusal to approve plans must be reasonable and made in good faith and must not be arbitrary or capricious"); *Kirkley* v. *Seipelt*, 212 Md. 127, 133, 128 A.2d 430 (App. 1957) ("any refusal to approve the external design or location . . . would have to be . . . a reasonable determination made in good faith, and not high-handed, whimsical or captious in manner"); *LeBlanc* v. *Webster*, 483 S.W.2d 647, 650 (Mo. App. 1972) ("we accept the validity of restrictions requiring prior approval or consent . . . but . . . such restrictions must be reasonably exercised"); *Cypress Gardens, Ltd.* v. *Platt*, supra, 124 N.M. 478 (plaintiff may "exercise its reserved authority to approve or reject" mobile homes "as long as it does so reasonably which includes in good faith").

The Restatement (Third) of Property, Servitudes, adopts such an approach. As the reporter's note states, it "follows the trend of modern statutes in taking an expansive view of the powers of a property-owners association with respect to . . . protection of property values in the community through covenant enforcement and other actions to advance the collective interests of the common-interest community." 2 Restatement (Third), Property, Servitudes § 6.4, reporter's note, p. 92 (2000). Although it disavows the existence of an implied design control power; see id., § 6.9 and comment (b), p. 171; the Restatement recognizes that the exercise of an explicit design control power is "likely to increase property values by preventing aesthetic nuisances"; id., § 6.9, comment (d), p. 173; as such power is "intended to protect the legitimate expectations of members of common-interest communities." Id., § 6.13, comment (a), p. 234; accord *Nahrstedt* v. *Lakeside Village Condominium Assn.*, supra, 8 Cal. 4th 381 ("[w]hen landowners express the intention to limit land

use, that intention should be carried out" [internal quotation marks omitted]).

With respect to design control powers that vest discretion in an association to approve a proposed activity, the Restatement notes "two kinds of risks for property owners. [First, owners] may not be able to develop in accordance with their expectations because they cannot predict how [that discretion] will be applied. Second, property owners may be subject to arbitrary or discriminatory treatment because there are no standards against which the appropriateness of the power's exercise can be measured." 2 Restatement (Third), Property, Servitudes § 6.9, comment (d), p. 173 (2000). To alleviate those risks, the Restatement imposes a reasonableness standard on the exercise of discretionary design control powers. Section 6.13 (1) provides in relevant part that an association has the duty "to act reasonably in the exercise of its discretionary powers including rulemaking, enforcement, and design-control powers . . . ."[24] Id., § 6.13 (1) (c), p. 233. The reasonableness standard "at its core, allows for an adjudicative posture that honors the fundamental underpinnings of association functioning and structure, is responsive to association aims, takes into account investment-backed owner expectations, and appreciates the potential for abuse." P. Franzese, "Common Interest Communities: Standards of Review and Review of Standards," 3 Wash. U. J.L. & Policy 663, 669 (2000).

## B

### *Weldy*

In *Weldy*, our Supreme Court, in accordance with courts throughout the country, recognized that a degree of deference is warranted to an association exercising its powers under a declaration. Relying on the Restatement (Third) of Property, Servitudes, the court observed that "declarations and other governing documents contain broad statements of general policy with due notice that the board of directors is empowered to implement these policies and address day-to-day problems in the [association's] operation. . . . Thus, the declaration should not be so narrowly construed so as to eviscerate the association's intended role as the governing body of the community. Rather, a broad view of the powers delegated to the association is justified by the important role these communities play in maintaining property values and providing municipal-like services." (Internal quotation marks omitted.) *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 737. The court continued: "Because an association's power should be interpreted broadly, the association, through its appropriate governing body, is entitled to exercise all powers of the community except those reserved to the members. . . . This broad view of the powers delegated to the [common interest community's] board of directors is consistent with the principle

inherent in the [common interest ownership] concept . . . that to promote the health, happiness, and peace of mind of the majority of the unit owners since they are living in such close proximity and using facilities in common, each unit owner must give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property. . . . [U]nit owners comprise a little democratic sub society of necessity more restrictive as it pertains to [the] use of [common interest] property than may be existent outside" the common interest community. (Citations omitted; internal quotation marks omitted.) Id., 738.

In so noting, our Supreme Court expressly relied on *Hidden Harbour Estates, Inc.* v. *Norman*, 309 So. 2d 180 (Fla. App. 1975), an early case that employed a reasonableness standard of review to discretionary association action. In that case, the court held that "the association is not at liberty to adopt arbitrary or capricious rules bearing no relationship to the health, happiness and enjoyment of life of the various unit owners. On the contrary, we believe the test is reasonableness." Id., 182. In another early decision addressing the exercise of such discretion, the Court of Appeals of Maryland similarly reasoned that "[t]he language used in the covenants . . . makes plain the desire to regulate the construction of the dwellings in such a manner as to create an attractive and desirable neighborhood. We think the parties had a right voluntarily to make this kind of a contract between themselves; and the covenant does not create any interference with the fee of the property that would require it to be stricken down as against public policy. It does not prevent the owner from conveying the property or impose any unlawful restraint of trade, but affects only its method of use. We hold that any refusal to approve the [proposed alterations] would have to be based upon a reason that bears some relation to the other buildings or the general plan of development; and this refusal would have to be a reasonable determination made in good faith, and not high-handed, whimsical or captious in manner." *Kirkley* v. *Seipelt*, supra, 212 Md. 133.

In *Weldy*, our Supreme Court instructed that review of an association's discretionary determinations requires a two part inquiry. "When a court is called upon to assess the validity of [an action taken] by [an association], it first determines whether the [association] acted within its scope of authority and, second, whether the [action] reflects *reasoned* or arbitrary and capricious decision making." (Emphasis added; internal quotation marks omitted.) *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 734. The first part of that inquiry is consonant with prior precedent indicating that the question of an association's authority to exercise certain rights under a declaration is governed by principles of contract interpretation. See *Cantonbury Heights Condominium Assn., Inc.* v. *Local*

*Land Development, LLC*, supra, 273 Conn. 734. The second part of that inquiry entails application of a reasonableness standard. Indeed, in its very next sentence, the court in *Weldy* noted that only the first part of the two part inquiry was at issue "[b]ecause the plaintiffs do not contend that the [association's discretionary determination] is unreasonable . . . ."[25] *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 734.

*Weldy* was decided by our Supreme Court in 2006. The two part test articulated therein has therefore governed review of determinations by common interest community associations in Connecticut for more than one decade. See, e.g., *Gugliemi* v. *Willowbrook Condominium Assn., Inc.*, Superior Court, judicial district of Hartford, Docket No. CV-11-6018687, 2013 Conn. Super. LEXIS 700 (March 28, 2013) (applying *Weldy*'s two part test), aff'd, 151 Conn. App. 806, 96 A.3d 634 (2014); *Weinstein* v. *Conyers Farm Corp.*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-X08-106006978-S, 2012 Conn. Super. LEXIS 2683, *19 (October 31, 2012) (reciting *Weldy*'s two part test and concluding that association's imposition of condition on construction approval was "reasonable"); *Bosco* v. *Arrowhead by the Lake Assn., Inc.*, Superior Court, judicial district of Waterbury, Docket No. CV-05-4007579-S, 2008 Conn. Super. LEXIS 1106 (May 8, 2008) (applying *Weldy*'s two part test).

C

Reasonableness

As courts across this state have recognized, *Weldy* articulated a two part test that governs review of discretionary association determinations. At the same time, that case involved no claim as to whether the association's determination was reasonable, a distinction underscored by our Supreme Court. Rather, "the only issue before the court" was the authority of the association. *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 734. The present case, by contrast, plainly involves a matter—specifically, the erection of fencing on the plaintiffs' unit—over which the association is vested with discretionary design control authority under the declaration. See Declaration of Rustle Meadow, §§ 10.1 (k) and 13.1 (a) (ii).[26] The plaintiffs recognized that authority in submitting written proposals that invoked those provisions of the declaration and requested the approval of the association thereunder.[27] Furthermore, we note that the declaration provisions in question themselves impart a reasonableness standard on the conduct of the association in exercising its design control powers. See footnote 26 of this opinion. Unlike *Weldy*, then, the issue before the court in this case is the reasonableness of the association's discretionary determination.

A criticism of some decisions that apply a reasonable-

ness standard in this context is that they do so "without defining what reasonable means." W. Hyatt, "Common Interest Communities: Evolution and Reinvention," 31 J. Marshall L. Rev. 303, 354 (1998). For example, in *Hidden Harbour Estates, Inc.* v. *Norman*, supra, 309 So. 2d 182, the court stated simply that "we believe the test is reasonableness. If a rule is reasonable the association can adopt it; if not, it cannot." Given the near universal recognition that a degree of deference to discretionary association determinations is appropriate, courts in recent years have noted the need for "a more objective 'reasonableness' standard by which to judge the discretionary actions of community associations." *Tierra Ranchos Homeowners Assn.* v. *Kitchukov*, supra, 216 Ariz. 200. An objective standard serves to minimize the potential that trial judges will substitute their subjective judgment for that of the entity explicitly and contractually entrusted with discretionary authority under the declaration.[28] As the Restatement notes, the proper application of the reasonableness standard must "protect the collective decisionmaking processes of common-interest communities from second-guessing by the judiciary . . . ." 2 Restatement (Third), Property, Servitudes § 6.13, comment (a), p. 235 (2000). A standard that is objective in nature and deferential to the exercise of association discretion nonetheless affords meaningful review. See *Lamden* v. *La Jolla Shores Clubdominium Homeowners Assn.*, 21 Cal. 4th 249, 269, 980 P.2d 940, 87 Cal. Rptr. 2d 237 (1999) (rejecting claim that "a rule of judicial deference will insulate community association boards' decisions from judicial review" and stating that the "judicial oversight" provided under deferential standard "affords significant protection against overreaching by such boards").

No Connecticut appellate court has addressed the contours of the reasonableness metric in the context of common interest ownership communities. It is appropriate, therefore, to look to other jurisdictions for guidance. *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 737.

Mindful of the deference accorded to associations vested with discretionary authority, many courts have held that a reasonableness analysis properly begins with consideration of the rationale and stated bases for the association's determination. See *Laguna Royale Owners Assn.* v. *Darger*, 119 Cal. App. 3d 670, 684, 174 Cal. Rptr. 136 (1981) ("[t]o determine whether or not [an] [a]ssociation's disapproval of [the proposed activity] was reasonable it is necessary to isolate the reason or reasons approval was withheld"); *McNamee* v. *Bishop Trust Co., Ltd.*, supra, 62 Haw. 406 (reasonableness analysis focuses on association's "reasons for disapproving the [plaintiffs'] application"); *Cypress Gardens, Ltd.* v. *Platt*, supra, 124 N.M. 478 ("[i]n determining what is reasonable in such cases, the trial court should consider the facts and circumstances surrounding" the

exercise of discretionary authority). In considering the rationale underlying the association's exercise of discretionary authority, a reviewing court should make "findings as to [the association's] intent and objectives [and] what substantial and reasonable interests would be protected by enforcing the restriction," as well as "findings as to the relation of the [proposed activity] to its surroundings and other buildings and structures in the subdivision." *Dodge* v. *Carauna*, supra, 127 Wis. 2d 67. Such findings are "crucial to a determination of the reasonableness" of an association's discretionary determination. Id.

Courts also give considerable weight to the purposes underlying a common interest community. As one stated, "[w]e hold that in exercising its [discretionary] power . . . [the] [a]ssociation must act reasonably, exercising its power in a fair and nondiscriminatory manner and withholding approval only for a reason or reasons rationally related to the protection, preservation and proper operation of the property and the purposes of [the] [a]ssociation as set forth in its governing instruments." *Laguna Royale Owners Assn.* v. *Darger*, supra, 119 Cal. App. 3d 680; see also *Perry* v. *Bridgetown Community Assn., Inc.*, 486 So. 2d 1230, 1234 (Miss. 1986) ("[r]eview by the court must be guided by the intent stated in the declaration"); *Lake at Twelve Oaks Homes Assn., Inc.* v. *Hausman*, supra, 488 S.W.3d 197 (focusing on "[t]he plain and obvious intent of the [d]eclarations" and its "purposes" in reviewing association exercise of design control discretion). Several commentators have suggested that this is an integral, if not predominant, consideration in evaluating the reasonableness of discretionary association action. See, e.g., P. Franzese, supra, 3 Wash. U. J.L. & Policy 687 ("courts ought to apply a reasonableness standard rooted in consideration of the association's legitimate objectives and an assessment of the rational relationship of the given action to those objectives"); R. Ellickson, "Cities and Homeowners Associations," 130 U. Pa. L. Rev. 1519, 1530 (1982) ("respect for private ordering requires a court applying the reasonableness standard to comb the association's original documents to find the association's collective purposes, and then to determine whether the association's actions have been consonant with those purposes"). We agree that consideration of the collective purposes of an association, as reflected in its governing instruments, is essential to the proper application of the reasonableness standard.

Accordingly, application of the reasonableness standard in the context of a challenge to discretionary association action cannot focus exclusively on the interests of the disgruntled unit owner or the executive board of an association. Rather, courts must remain cognizant of the larger interest of the common interest community. See *Nahrstedt* v. *Lakeside Village Condominium Assn.*, supra, 8 Cal. 4th 386 (reasonableness "to be deter-

mined not by reference to facts that are specific to the objecting homeowner, but by reference to the common interest development as a whole" [emphasis omitted]); P. Franzese, supra, 3 Wash. U. J.L. & Policy 684 (noting cases that "nicely advance a fact-specific approach rooted not in the circumstances peculiar to the individual unit owner but instead in consideration of the given community's unique character and purposes when viewed as a whole"). As the Restatement recognizes, restrictive covenants that vest discretionary authority in an association are "intended to protect the legitimate expectations of members of common-interest communities." 2 Restatement (Third), Property, Servitudes § 6.13, comment (a), p. 234 (2000); see also *Nahrstedt* v. *Lakeside Village Condominium Assn.*, supra, 372 ("[u]se restrictions are an inherent part of any common interest development and are crucial to the stable, planned environment of any shared ownership arrangement"); *Rhue* v. *Cheyenne Homes, Inc.*, supra, 168 Colo. 8 ("restrictive covenants . . . guarantee to the purchaser that his house will be protected against adjacent construction which will impair its value, and that a general plan of construction will be followed"); *Riss* v. *Angel*, supra, 131 Wn. 2d 623–24 (urging "special emphasis on [protecting] the homeowners' collective interests" [internal quotation marks omitted]). The interests of that constituency must be considered in applying the reasonableness standard.

At the same time, an association cannot exercise its discretionary authority in an arbitrary or capricious manner. *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 734; see also *Worthinglen Condominium Unit Owners' Assn.* v. *Brown*, 57 Ohio App. 3d 73, 76, 566 N.E.2d 1275 (1989) (determination of "whether the decision or rule was arbitrary or capricious" entails consideration of whether "there be some rational relationship of the decision or rule to the safety and enjoyment of the [common interest community]" [emphasis omitted]). That authority must be exercised in good faith and not in a discriminatory manner. See *Worthinglen Condominium Unit Owners' Assn.* v. *Brown*, supra, 76. Examples of conduct that substantiated a finding that an association's determination was unreasonable include a case in which "there is no evidence that the [association's executive board] reasonably assessed the impact of" the proposed activity or that it "visited the site, much less with an eye to neighbors' views or privacy"; *Riss* v. *Angel*, supra, 131 Wn. 2d 628; and one in which the architectural control committee failed to "undertake . . . a minimum effort" to visit "the proposed construction site" and failed to ascertain "its impact on [neighboring] properties." *Leonard* v. *Stoebling*, 102 Nev. 543, 549, 728 P.2d 1358 (1986). The selective enforcement of a restriction against a unit owner likewise has been deemed arbitrary and unreasonable in certain circumstances. See *White*

*Egret Condominium, Inc.* v. *Franklin*, 379 So. 2d 346, 352 (Fla. 1979) (holding that use restriction in declaration "was reasonably related to a lawful objective" but association nonetheless "is estopped from selectively enforcing [that] restriction"). An association's discretionary design control determination also was deemed arbitrary when "the record is devoid of an objective showing that [the proposed activity is] aesthetically disharmonious with the character of, or that [it] detract[s] from, the quality of the neighborhood." *Kies* v. *Hollub*, 450 So. 2d 251, 256 (Fla. App. 1984). Similarly, an association's denial of permission for a unit owner "to proceed with [a] heating and air conditioning upgrade"; *Billig* v. *Buckingham Towers Condominium Assn. I, Inc.*, 287 N.J. Super. 551, 555, 671 A.2d 623 (App. 1996); was "not reasonable because the change did not materially or appreciably affect the [common interest community] property, the common elements, the limited common elements, the collective interests of the unit owners, or the interests of any individual unit owner." Id., 564. In all such cases, the specific nature of the proposed activity was weighed against the interests of the common interest community.

Before turning our attention to the decision of the trial court, two additional aspects of the reasonableness standard merit discussion. The first pertains to the allocation of the burden of proof in an action in which a unit owner in a common interest community challenges an association's discretionary decisionmaking. Although our appellate courts have not addressed this issue, we note that our Supreme Court in *Weldy* expressly relied on the Restatement (Third) of Property, Servitudes, in recognizing a broad view of the powers delegated to the association and the corresponding deference accorded thereto. See *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 737–38. Addressing the duty of an association to act reasonably in exercising discretionary powers, the Restatement places the "burden of proving a breach of duty by the association" on a unit owner "challenging an action of the association under this section . . . ."[29] 2 Restatement (Third), Property, Servitudes § 6.13 (2), p. 233 (2000). As the commentary explains, "the purpose of this subsection is to protect the collective decisionmaking processes of common-interest communities from second-guessing by the judiciary and to protect the community from the expenses of too-ready resort to litigation by disgruntled community members, while at the same time protecting individual members from improper management and imposition by those in control of the association." Id., § 6.13, comment (a), p. 235. We believe that this allocation best comports with the presumption, reflected in the act, of voluntary participation of owners within a common interest ownership community; *Wilcox* v. *Willard Shopping Center Associates*, supra, 208 Conn. 326; and the community's

substantial interest in safeguarding the rights of all unit owners; *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 738; who rely on the plan of development set forth in the declaration being carried out. *Mannweiler* v. *LaFlamme*, supra, 46 Conn. App. 536 (noting unit owners' interest in "the uniform development plan being carried out").

Furthermore, a contrary result strikes us as illogical in light of the deference accorded to associations in matters involving discretionary determinations under a declaration, as well as our Supreme Court's "broad view of the powers" delegated to an association in a common interest community. *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 738. It would be truly bizarre if—in a civil action commenced by a unit owner contesting an association's discretionary decision-making—the association, and not the party challenging the determination, bore the burden to demonstrate that it properly exercised that discretion.[30] We concur with the approach avowed in the Restatement and other jurisdictions that places the burden on the challenging party to demonstrate that an association or its executive board improperly exercised the discretionary decisionmaking authority accorded to it by the declaration of a common interest community.

A second noteworthy aspect of the reasonableness standard pertains to its inherent nature. As many courts have recognized, the determination of whether an association reasonably exercised its discretion is a question of fact.[31] Connecticut law likewise recognizes that the question of reasonableness presents an issue of fact. See, e.g., *Deming* v. *Nationwide Mutual Ins. Co.*, 279 Conn. 745, 759 n.15, 905 A.2d 623 (2006) ("whether a covenant is reasonable is a question of fact"); *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 580, 657 A.2d 212 (1995) ("[w]e have consistently held that reasonableness is a question of fact for the trier to determine based on all of the circumstances"); *National Groups, LLC* v. *Nardi*, 145 Conn. App. 189, 199, 75 A.3d 68 (2013) (reasonableness a question of fact for trier to determine).

In *Peterson* v. *Oxford*, 189 Conn. 740, 745–46, 459 A.2d 100 (1983), our Supreme Court described the application of a reasonableness standard as "a weighing analysis" that entails consideration of "all the relevant circumstances" and factors. Cf. *Cypress Gardens, Ltd.* v. *Platt*, supra, 124 N.M. 478 ("[i]n determining what is reasonable . . . the trial court should consider the facts and circumstances surrounding" the exercise of discretionary design control authority); *Shipler* v. *Van Raden*, 41 Or. App. 425, 429, 599 P.2d 1141 (1979) ("[r]estrictive covenants are to be construed in the light of reasonableness under the circumstances"). The present case likewise calls for such a weighing analysis by the trier of fact. With that standard in mind, we turn

to the decision of the trial court.

## D

### Trial Court Decision

On January 14, 2015, the court issued its memorandum of decision. In that decision, the court specifically addressed the propriety of the green zone and the association's failure to approve the plaintiffs' fence proposal. It stated: "Is there a green zone? The short answer is no. At the start of this trial, this court granted the plaintiffs' motion in limine prohibiting the defendants from introducing any unrecorded maps or unrecorded documents that show a green zone. The court found that the green zone is not reasonable because it was not in writing, that the green zone, being unwritten, is not sufficient notice to a prospective buyer. . . . The green zone as hereinbefore described is in the mind of Miller, and there is nothing in writing in the declaration or bylaws to indicate to anyone, including the plaintiffs, that there is a green zone, namely, a fifteen foot wide piece of land claimed by Miller from the boundary of the plaintiffs' in toward the rest of their property, a distance of fifteen feet, surrounding the entire property of the plaintiffs. Accordingly, this court finds that it was illegal and inequitable for the association to deny the applications for a fence around the pool in the green zone hereinbefore described." (Citation omitted.) In a later portion of the decision concerning "the defendants' actions in restricting landscaping by the plaintiffs," the court likewise noted that the conduct of the association in "withholding . . . the approval for a fence" was unreasonable because the "green zone . . . did not exist in writing . . . ." On appeal, the defendants contest the propriety of those determinations.

### 1

### Motion in Limine

We begin with the defendants' contention that the court improperly granted the motion in limine to preclude evidence relating to the green zone. The following additional facts are relevant to that issue. One day prior to trial, the plaintiffs filed a motion in limine seeking to preclude any testimony or documentation "that relates to the green zone." The plaintiffs emphasized that all restrictions on the use of property within a common interest community are required to be included in the declaration thereof. Because Miller admitted in his deposition testimony that the term "green zone" is not contained in either the declaration or any other material recorded on the Canton land records, the plaintiffs argued that "the green zone is clearly unenforceable" under the act.

When the court heard argument on the motion on the first day of trial, the defendants' counsel responded by stating, "Your Honor, this motion in limine is a wonderful way to start this case because it identifies where

the issues are, where the conflicts are" between the parties. He emphasized that the declaration expressly vests discretionary authority in the association to approve or deny all exterior development and landscaping within Rustle Meadow.[32] At that time, counsel brought *Weldy* to the court's attention, which he described as "the only . . . Supreme Court case on point," and furnished a copy of that decision to the court. He stated that, in *Weldy*, "the [Supreme Court] was called upon for the first time . . . to decide how [to] deal with" the discretion of an association in a common interest community. Noting the two part test articulated therein, counsel explained that "the second part of the test [asks whether] the homeowners' association acted reasonably or did it act arbitrarily and capriciously." The ultimate issue before the court, he continued, was the determination of whether the association reasonably exercised its discretionary authority. Accordingly, he argued that evidence of the "green zone" was both relevant and necessary to resolving that issue.

The trial court did not agree with the defendants. It stated: "The motion in limine is granted. . . . Apparently [Miller] decided what the green zone is, and . . . it doesn't seem to me that it's reasonable if it is not in writing. If he wants to testify as to why he did what he did, I don't have a problem with that. I'll evaluate that as I will any other witness, but I'm . . . granting the motion in limine because I don't think that the so-called green zone, being unwritten, is . . . sufficient notice to the prospective buyer. I mean, [Miller] says in his deposition that if you want to know what the green zone is, ask me. I don't think that's sufficient. . . . [I]f we're talking about discretion, at this point I think that is . . . beyond discretion."

The court thereafter excluded or redacted certain evidence and testimony throughout the course of trial. For example, the court redacted Miller's statement that "[t]he [fifteen] foot green zone needs to be respected" from his July 22, 2008 e-mail to the plaintiffs, which was sent *prior* to the construction of the swimming pool. The court likewise redacted the plaintiffs' July 23, 2008 response to that communication, in which they stated that they were "confident that when the pool and grading is done, the green zone will be at least the [fifteen] feet. Looking at the [southeasterly] side yard, it looks like the only area the dirt is encroaching is by the side of the deck. Once [the] patio is in and we do landscaping I am sure you will be pleased with the amount of green we add or maintain."

On appeal, the defendants claim that the court improperly excluded such evidence regarding the green zone. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court." (Internal quotation marks omitted.) *Olson*

v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156, 757 A.2d 14 (2000). Evidentiary claims ordinarily are governed by the abuse of discretion standard. See, e.g., *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 250 n.9, 9 A.3d 364 (2010). That deferential standard, however, does not apply when "the trial court's ruling on the motion in limine . . . was based on [a] legal determination . . . ." *Duffy* v. *Flagg*, 279 Conn. 682, 688–89, 905 A.2d 15 (2006). As the court indicated in its memorandum of decision, its ruling on the motion in limine was based on its legal determination that the green zone needed to be in writing.[33] Accordingly, the applicable standard of review requires this court to determine "whether the trial court was legally and logically correct when it decided, under the facts of the case, to exclude evidence" of the green zone. Id., 689. Our review, therefore, is plenary. See *Robinson* v. *Cianfarani*, 314 Conn. 521, 525, 107 A.3d 375 (2014) (when trial court draws conclusions of law, review is plenary as to whether conclusions are legally and logically correct and find support in facts that appear in record).

On appeal, the plaintiffs submit that the court properly determined that the green zone had to be in writing. In so doing, however, they rely on decisional law arising outside the context of common interest communities. See, e.g., *Wykeham Rise, LLC* v. *Federer*, 305 Conn. 448, 52 A.3d 702 (2012); *Katsoff* v. *Lucertini*, 141 Conn. 74, 103 A.2d 812 (1954); *Hooker* v. *Alexander*, 129 Conn. 433, 29 A.2d 308 (1942); *Kepple* v. *Dohrmann*, 141 Conn. App. 238, 60 A.3d 1031 (2013); *DaSilva* v. *Barone*, 83 Conn. App. 365, 849 A.2d 902, cert. denied, 271 Conn. 908, 859 A.2d 560 (2004); *Grady* v. *Schmitz*, 16 Conn. App. 292, 547 A.2d 563, cert. denied, 209 Conn. 822, 551 A.2d 755 (1988); *Marion Road Assn.* v. *Harlow*, 1 Conn. App. 329, 472 A.2d 785 (1984); *Thompson* v. *Fairfield Country Day School Corp.*, Superior Court, judicial district of Fairfield, Docket No. CV-02-0396513 (November 20, 2003) (36 Conn. L. Rptr. 45); *Witter* v. *Taggart*, 78 N.Y.2d 234, 577 N.E.2d 338, 573 N.Y.S.2d 146 (1991); *Nature Conservancy* v. *Congel*, 296 App. Div. 2d 840, 744 N.Y.S.2d 281, leave to appeal denied, 99 N.Y.2d 502, 782 N.E.2d 567, 752 N.Y.S.2d 589 (2002). There is no indication in any of those cases that the restriction at issue pertained to a common interest community or involved a declaration of restrictive covenants that conferred discretionary design control authority on an association thereof. Those decisions, therefore, are inapposite to the present case.

The plaintiffs' reliance on the statute of frauds likewise is untenable. Under Connecticut law, the statute of frauds operates as a special defense to a civil action. See, e.g., *Suffield Development Associates Ltd. Partnership* v. *Society for Savings*, 243 Conn. 832, 835 n.5, 708 A.2d 1361 (1998) (noting that defendant raised "the special defense of the statute of frauds"); *Levesque*

*Builders, Inc.* v. *Hoerle*, 49 Conn. App. 751, 754, 717 A.2d 252 (1998) ("[t]he defendant filed a special defense, claiming that the contract was unenforceable because it failed to comply with . . . the statute of frauds"). The statute of frauds provides in relevant part that "[*n*]*o civil action may be maintained* in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (4) upon any agreement for the sale of real property or any interest in or concerning real property . . . ." (Emphasis added.) General Statutes § 52-550 (a). In this case, however, it is the plaintiffs who have maintained the civil action challenging the discretionary determination of the association. Because "a special defense operates as a shield, to defeat a cause of action, and not as a sword, to seek a judicial remedy for a wrong"; *Bank of America, N.A.* v. *Aubut*, 167 Conn. App. 347, 374, 143 A.3d 638 (2016); the plaintiffs' resort to the statute of frauds in this case is unavailing.

More significantly, this is not a case that lacks a written agreement. Under Connecticut law, restrictive covenants in a common interest community must be included in the declaration thereof; General Statutes § 47-224 (a) (12); which, in turn, must be filed on the land records. General Statutes § 47-220 (a). Consistent with that statutory imperative, the Declaration of Rustle Meadow was recorded on the Canton land records prior to the plaintiffs' purchase of their unit in the common interest community. That declaration contains numerous restrictive covenants. At trial, the plaintiffs testified that they reviewed the declaration prior to purchasing their unit and were aware of the restrictive covenants contained therein. See *Dolan-King* v. *Rancho Santa Fe Assn.*, 81 Cal. App. 4th 965, 971, 97 Cal. Rptr. 2d 280 (plaintiff "was aware of the [c]ovenant's existence and had 'read over it' before she agreed to purchase the house"), review denied, 2000 Cal. LEXIS 7972 (Cal. October 3, 2000).

The declaration contains reciprocal provisions regarding the association's discretionary authority over design control matters. See footnote 26 of this opinion. Section 10.1 (k) of Article X vests sweeping design control powers in the association, which, like those at issue in *Buick* v. *Highland Meadow Estates at Castle Peak Ranch, Inc.*, supra, 21 P.3d 863, "grant the [association] broad latitude in making aesthetic decisions with respect to every type of improvement on the property . . . ." The exercise of that broad discretion, however, remains subject to a reasonableness standard, as § 10.1 (k) provides that approval thereunder "shall not be unreasonably withheld." Section 13.1 (a) (ii) of Article XIII, in turn, expressly prohibits unit owners from making "any changes, additions, alterations, or improvements . . . in or on any Unit" without prior written approval from the association in accordance with § 10.1

(k). At trial, Kristine Grovenburg acknowledged that the association had discretion to approve all exterior changes to her unit pursuant to the declaration and that she was required to obtain its permission prior to making any such alterations or improvements.

The record before us contains ample documentary evidence indicating that the so-called "green zone" was a criterion considered by the association in the exercise of its discretionary design control authority under §§ 10.1 (k) and 13.1 (a) of the declaration.[34] In a portion of deposition testimony that was admitted into evidence, the plaintiffs' counsel inquired as to Miller's use of the term "green zone" in communications with the plaintiffs. The following colloquy transpired:

"[The Plaintiffs' Attorney]: Why did you use the word Green Zone in your e-mail? . . .

"[Miller]: Because—I used the phrase, fifteen foot Green Zone, because I had discussed with the [plaintiffs] previously the fifteen foot Green Zone, and that's why I said it needed to be respected.

"[The Plaintiffs' Attorney]: Can you define the fifteen foot Green Zone, please?

"[Miller]: It's a visual buffer that is one of the standards that the association uses to evaluate changes to landscaping and—evaluate changes to landscaping and the—in the conduct of its business of the subdivision.

"[The Plaintiffs' Attorney]: And it is sort of unclear. When you were describing the Green Zone as a buffer, can you just articulate what, in your definition, a fifteen foot Green Zone is as it relates to the plaintiffs' property?

"[Miller]: "It's an area where natural vegetation would be protected and not removed, destroyed, cut, or in other ways inhibited so as to provide a visual buffer between adjoining building lots."

In his July 2, 2010 e-mail to the plaintiffs, Miller similarly stated that "[t]he green zone falls within the authority of the board in approving landscape changes after construction. The 'green zone' is simply a term which names a section of the land adjacent to the wooded property lines where the association will tightly regulate any landscape changes to maximize the visual buffer between adjacent lots." In a subsequent e-mail sent days later, Miller informed the plaintiffs that "[m]aintaining a visual buffer between lots in this community is a . . . criteri[on] from which to make a decision . . . ." The minutes of the association's June 21, 2013 annual meeting likewise reflect that discussion transpired on "the need to maintain a visual green zone buffer between units for privacy and to maintain the wooded character of the community." Similarly, when Miller contacted the Canton building department in 2011, he made no mention of any "green zone," but rather indicated that

the plaintiffs had proposed a fence within a "visual buffer zone." That correspondence further indicated that the plaintiffs' proposal had been denied because it "placed the fence *unnecessarily* within" that visual buffer zone. (Emphasis added.)

Throughout this litigation, the defendants have conceded that there is no reference to either the "green zone" or that visual buffer area in the declaration or other documents of Rustle Meadow. Courts across the country nevertheless have rejected similar claims regarding the lack of written, objective standards to guide the exercise of broadly drawn design control powers.[35] At the same time, the exercise of discretionary design control powers that do not contain explicit standards remains subject to a reasonableness standard.[36] The Restatement (Third) of Property, Servitudes, likewise provides that a common interest associations has a duty "to act reasonably in the exercise of its discretionary powers including rulemaking, enforcement, and design-control powers . . . ." 2 Restatement (Third), Property, Servitudes § 6.13 (1), p. 233 (2000). That standard is consistent with the broad view of powers delegated to common interest associations espoused by our Supreme Court in *Weldy*, as well as the precept that restrictive covenants vesting broad discretionary authority in an association are "intended to protect the legitimate expectations of members of common-interest communities." Id., § 6.13, comment (a), p. 234.

Furthermore, we perceive a practical problem with the position urged by the plaintiffs. If the discretionary criteria to be considered by an association in exercising its design control powers must be specifically enumerated and explicated in writing, the size and complexity of such covenants increases exponentially. Section 10.1 (k) of the declaration plainly confers on the association the authority to evaluate aesthetic considerations. Yet, as one court aptly observed, "[t]he covenant, by making no attempt to set forth objective 'aesthetic considerations,' implicitly recognizes, as do we, that it is impossible to establish absolute standards to guide a judgment of taste." *Palmetto Dunes Resort* v. *Brown*, 287 S.C. 1, 6–7, 336 S.E.2d 15 (App. 1985). "Great minds have struggled for centuries to define aesthetic considerations. . . . The law, in all its majesty, cannot compel the definition of the indefinable." (Citations omitted; internal quotation marks omitted.) Id., 7 n.2; accord *Dolan-King* v. *Rancho Santa Fe Assn.*, supra, 81 Cal. App. 4th 976 (restrictive covenant conferring discretionary design control authority "expressly grants the [a]ssociation . . . broad authority to apply standards that are inherently subjective and by their nature cannot be measured or quantified"). As our precedent instructs, determining what is reasonable necessarily entails consideration of the specific circumstances and factors at play in a given instance.[37] *Williams Ford, Inc.* v. *Hartford Courant Co.*, supra, 232 Conn. 580; *Peterson* v.

*Oxford*, supra, 189 Conn. 745. The task of preparing a compendium of all potentially relevant considerations would be Sisyphean.

In *Weldy*, our Supreme Court adopted a "broad view" of the discretionary authority contractually accorded to associations in common interest communities; *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 738; and set forth a reasonableness standard to govern review thereof. In accordance with that precedent, as well as the authority of sibling jurisdictions discussed in this opinion and the Restatement (Third) of Property, Servitudes, we conclude that a restrictive covenant in a declaration of a common interest community that confers broad design control authority on an association need not specifically state the criteria to be considered in the exercise of that authority. That authority must be exercised reasonably, and not in an arbitrary or capricious manner. Id., 734.

Whether termed a "green zone," a "visual buffer," or a "visual green zone buffer," evidence regarding that criterion was highly relevant to the question of whether the association reasonably exercised its discretionary design control authority. In granting the motion in limine, the court prohibited the defendants from introducing, inter alia, evidence (1) of the rationale for that criterion, which impaired the court's ability to determine whether the association's exercise of discretionary authority was based on legitimate interests of the common interest community, (2) that the plaintiffs had actual notice of that criterion prior to the construction of their swimming pool, and (3) that the association previously had permitted activity in the green zone area of the plaintiffs' unit when a septic system was installed. The preclusion of such evidence was harmful, as it likely affected the result in the present case. See *Danko* v. *Redway Enterprises, Inc.*, 254 Conn. 369, 383, 757 A.2d 1064 (2000). We, therefore, conclude that the court improperly granted the motion in limine to preclude evidence regarding the green zone.

2

Application of Reasonableness Standard

We next consider the defendants' contention that the trial court applied an improper legal standard in evaluating the association's exercise of its discretionary design control authority regarding the plaintiffs' fence proposal. The defendants claim that the court's analysis departed from the mandate of *Weldy*, which espoused a deferential view of discretionary association authority, the exercise of which is governed by a standard of reasonableness. At its essence, their claim is that the court departed from that deferential posture and failed to engage in a proper reasonableness analysis in the context of common interest communities. We agree.

The court's decision contains no reference to the act,

*Weldy*,[38] or any authority from Connecticut or elsewhere pertaining to common interest communities. Its sole legal citation is to *Busker* v. *United Illuminating Co.*, 156 Conn. 456, 458, 242 A.2d 708 (1968), a case regarding a real estate commission a half century ago that recites the preponderance of the evidence standard generally applicable to civil proceedings. Nothing in the court's decision acknowledges the considerable discretion accorded the association under the applicable provisions of the declaration; see footnote 26 of this opinion; and the precedent of this state's highest court, which recognizes a "broad view of the powers delegated to" common interest associations under a declaration. *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 738; accord *Dolan-King* v. *Rancho Santa Fe Assn.*, supra, 81 Cal. App. 4th 978–79 (holding that trial court "failed to apply the proper deferential standard to test the [b]oard's exercise of discretion" and instead substituted "its own judgment based upon its own evaluation of [the plaintiff's] applications").

The legal basis articulated in the court's memorandum of decision was its determination that the visual buffer area known as the green zone was illegal and unreasonable because it was not in writing. In part I D 1 of this opinion, we have explained why that determination is untenable. The critical inquiry, then, is whether the association's exercise of its design control authority "reflects reasoned or arbitrary and capricious decision making." (Internal quotation marks omitted.) *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 734.

Application of the reasonableness standard properly begins with consideration of the association's discretionary determination and the reasons therefor. Regrettably, the court's decision contains no discussion of that essential component of a reasonableness analysis. The record indicates that the association's exercise of its design control authority over the proposed fencing on the plaintiffs' unit was animated by two related interests—the desire to maintain a visual buffer to preserve privacy within the common interest community, and the desire to maintain the wooded character of that community. In various correspondence with the plaintiffs, Miller, on behalf of the association, stated that "[t]he 'green zone' is simply a term which names a section of the land adjacent to the wooded property lines where the association will tightly regulate any landscape changes to maximize the visual buffer between adjacent lots." The minutes of the association's June 21, 2013 annual meeting likewise reflect that "[d]iscussion was held regarding the visual buffer area between units that the board calls the green zone," and, specifically, "the need to maintain a visual green zone buffer between units for privacy and to maintain the wooded character of the community."[39] The trial court, however, furnished no findings as to whether main-

taining privacy between units and preserving the wooded character of the community were legitimate interests of the common interest community.

There also is no indication that the trial court examined the governing instruments of the community to ascertain the collective purposes of the association. We note in this respect that although §§ 10.1 (k) and 13.1 (a) confer broad design control authority on the association; see footnote 26 of this opinion; one aspect of that authority is identified with particular specificity. Section 13.1 (a) (ii) provides in relevant part that a unit owner "[m]ay not make any changes, additions, alterations, or improvements to any structure in or on any Unit or to the Common Elements or make any substantial change to the topography of a Unit or to the Common Elements *including the removal of trees*, without the prior written approval" of the association. (Emphasis added.) Section 10.1 (k) likewise proscribes the "removal of any trees without the prior written consent" of the association. The court's factual determination as to whether the association's discretionary action was reasonable must weigh the intent and purpose of those explicit contractual provisions set forth in the declaration. *Lake at Twelve Oaks Homes Assn., Inc.* v. *Hausman*, supra, 488 S.W.3d 197; see also *Laguna Royale Owners Assn.* v. *Darger*, supra, 119 Cal. App. 3d 680 (courts must consider "the purposes of [the] [a]ssociation as set forth in its governing instruments"); *Perry* v. *Bridgetown Community Assn., Inc.*, supra, 486 So. 2d 1234 ("[r]eview by the court must be guided by the intent stated in the declaration").

Had the court found that the interests proffered by the association were legitimate ones, it next would have to determine whether the association's exercise of its discretionary design control authority was rationally related thereto. See, e.g., *Laguna Royale Owners Assn.* v. *Darger*, supra, 119 Cal. App. 3d 680 (exercise of discretionary authority must be "rationally related to the protection, preservation and proper operation of the property and the purposes of [the] [a]ssociation as set forth in its governing instruments"); *Kirkley* v. *Seipelt*, supra, 212 Md. 133 (exercise of discretion must be "based upon a reason that bears some relation to the other [units] or the general plan of development"); *Worthinglen Condominium Unit Owners' Assn.* v. *Brown*, supra, 57 Ohio App. 3d 76 (determination of "whether the decision or rule was arbitrary or capricious" entails consideration of whether "there be some rational relationship of the decision or rule to the safety and enjoyment of the [common interest community]" [emphasis omitted]).

The record is hampered by the fact that the court did not make any findings as to the substance of the proposal that the plaintiffs submitted to the association.[40] The undisputed documentary evidence in the

record indicates that, under the plaintiffs' revised proposal, fencing would be erected approximately eight feet from the southeasterly properly line, with "Scabrida Clumping Bamboo" to be planted "every [six-eight] feet" between the fence and the property line. At the behest of the association, the plaintiffs also submitted written documentation indicating that "[t]he bamboo grows [twelve-fourteen feet] tall by [three feet] wide for each bush" and that this species "is non-invasive, vigorous and easy to grow . . . ." Essential to any determination of whether the association's exercise of its discretionary authority was reasonable are factual findings as to the specifics of the plaintiffs' proposal and their relationship to the association's stated interests in maintaining privacy between units and preserving the wooded character of the community.[41] No such findings are present in the court's decision. Absent such factual findings, a court reviewing the discretionary determination of an association cannot properly ascertain whether any legitimate interests of the common interest community justify the denial of a proposed activity. See, e.g., *Dodge* v. *Carauna*, supra, 127 Wis. 2d 67 (findings as to "what substantial and reasonable interests would be protected by enforcing the restriction" are "crucial to a determination of the reasonableness" standard).

The record is further impaired by the court's erroneous granting of the motion in limine, which we discussed in part I D 1 of this opinion. As a result, the defendants were precluded from presenting relevant and probative evidence regarding the visual buffer area known as the green zone. For example, the defendants at trial attempted to introduce into evidence documentation of the location of a septic system that was installed on the plaintiffs' property. When the court inquired as to "the purpose" of such evidence, their counsel noted that the septic system was shown on that document to be "well within" the green zone area. Counsel thus argued that the document undermined any claim "of the green zone being this absolute, incontrovertible thing . . . ." After Miller confirmed that the document was on file with the town health department, the defendants' counsel stated that "what it goes to is the idea that there's this inviolate green zone that cannot be touched, and . . . this simply shows the location of the septic system within that area . . . much closer to the lot line." The plaintiffs' attorney objected on the basis of the court's prior ruling on the motion in limine. The court sustained that objection, stating, "I don't see the relevance of this at all," and thus precluded evidence of that intrusion into the green zone.[42]

In granting the motion in limine, the court also foreclosed the introduction of evidence as to whether the plaintiffs had actual notice of the green zone, as the defendants steadfastly maintained. As this court has observed, "[t]he concept of notice concerns notions of

fundamental fairness, affording parties the opportunity to be apprised when their interests are implicated in a given matter. . . . [T]he modern approach to notice-giving attaches primary importance to actual notice and treats technical compliance with notice procedures as a secondary consideration." (Citations omitted; internal quotation marks omitted.) *Twenty-Four Merrill Street Condominium Assn., Inc.* v. *Murray*, 96 Conn. App. 616, 622–23, 902 A.2d 24 (2006); cf. *O'Connor* v. *Larocque*, 302 Conn. 562, 611 n.5, 31 A.3d 1 (2011) (notice is question of fact to be resolved by trier of fact). At trial, the defendants attempted to admit into evidence multiple written correspondences in which the plaintiffs affirmatively discussed the green zone. For example, the court declined to admit the plaintiffs' statement in their July 27, 2008 e-mail to Miller—sent prior to the construction of the swimming pool—that the plaintiffs were "confident that when the pool and grading is done, the green zone will be at least the [fifteen] feet. . . . Once [the] patio is in and we do landscaping I am sure you will be pleased with the amount of green we add or maintain."[43] The issue of the plaintiffs' notice of the green zone is yet another unresolved factual matter that a reviewing court must consider in weighing "all the relevant circumstances"; *Peterson* v. *Oxford*, supra, 189 Conn. 745; to determine whether the association's exercise of discretionary authority was reasonable in the present case.

The court appears to have deemed the "green zone" visual buffer area to be a blanket restriction barring all use of that portion of the plaintiffs' unit. Such a determination is problematic for a number of reasons. First, the court's granting of the motion in limine precluded the defendants from offering documentary and testimonial evidence as to the nature of the green zone and how it had been implemented by the association over the years, such as evidence that a septic system was permitted in that area. Second, it is contrary to undisputed evidence in the record indicating that the association entertained proposed intrusions into that area. The record includes Miller's e-mail response to the plaintiffs' initial fence proposal, in which he informed them that the proposed fence "will *most likely* not be approved any closer than [fifteen] feet to the property line." (Emphasis added.) The record also reflects that the association never denied the plaintiffs' revised proposal for a fence "approximately eight feet" from the southeasterly side yard property line. Rather, the association requested additional information on the nature of certain plantings that were proposed along the property line, and their "mature height" specifically. Furthermore, it is undisputed that the parties thereafter engaged in negotiations over the course of several months—well before the commencement of this litigation—in an attempt to work "out [the] details of a settlement."[44] The association's willingness to engage in such

negotiations and to consider the revised proposal with specific plantings cannot be reconciled with a determination that the green zone was a blanket prohibition applied by the association. See, e.g., *Chateau Village North Condominium Assn.* v. *Jordan*, 643 P.2d 791, 792–93 (Colo. App. 1982) (association board improperly applied blanket policy against unit owner by failing to even consider "the facts of [the owner's] individual application"). Here, the record plainly indicates that the association did not summarily deny the plaintiffs' proposal, as that proposal remained pending at the time that the plaintiffs commenced this action.[45] The manner and extent to which the association considered the particular facts of the plaintiffs' proposal is but another unresolved factual issue relevant to the court's weighing analysis.

As we have observed, the reasonableness of the association's exercise of discretionary design control authority involves a question of fact. Resolution of that factual question necessarily is beyond the purview of an appellate court, as "it is axiomatic that this appellate body does not engage in fact-finding."[46] *Hogan* v. *Lagosz*, 124 Conn. App. 602, 618, 6 A.3d 112 (2010), cert. denied, 299 Conn. 923, 11 A.3d 151 (2011). Connecticut's appellate courts "cannot find facts; that function is, according to our constitution, our statute, and our cases, exclusively assigned to the trial courts." *Weil* v. *Miller*, 185 Conn. 495, 502, 441 A.2d 142 (1981). Accordingly, a remand to the trial court for a new trial is necessary. As the Colorado Court of Appeals noted in a similar appeal, "[t]he determination of whether a homeowners association has acted reasonably or arbitrarily is a question of fact. . . . Therefore, we conclude that . . . we must remand this case to the trial court for a determination . . . of the question of fact of whether the association acted reasonably when it denied the homeowners' plan." (Citation omitted.) *Gleneagle Civic Assn.* v. *Hardin*, supra, 205 P.3d 470; accord *Cypress Gardens, Ltd.* v. *Platt*, supra, 124 N.M. 478 (remanding to trial court for factual determination and noting that "[i]n determining what is reasonable in such cases, the trial court should consider the facts and circumstances surrounding the application of" discretionary design control authority); *Worthinglen Condominium Unit Owners' Assn.* v. *Brown*, supra, 57 Ohio App. 3d 78 (remanding to trial court "for consideration of the reasonableness" of association's discretionary determination); *Dodge* v. *Carauna*, supra, 127 Wis. 2d 67 (noting that "[a] number of findings crucial to a determination of the reasonableness" of discretionary determination "are missing" and remanding matter to trial court for further proceedings).

3

Conclusion

In light of the foregoing, we agree with the defendants

that the court failed to properly apply the legal standard governing review of discretionary decisionmaking authority by the association. Such review is not governed by the preponderance of the evidence standard generally applicable to civil proceedings.[47] Rather, *Weldy* directs a court reviewing the exercise of discretionary association action to engage in a two part analysis, the latter of which requires a finding as to whether the association's determination was reasonable. *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 734. Proper application of that reasonableness standard, in turn, requires certain predicate findings that are lacking in the present case. We therefore remand the matter to the trial court for a new trial with direction to apply that legal standard.

On remand, in rendering a factual finding on the issue of reasonableness, the trial court must objectively weigh the relevant circumstances and factors. *Williams Ford, Inc.* v. *Hartford Courant Co.*, supra, 232 Conn. 580; *Peterson* v. *Oxford*, supra, 189 Conn. 745–46. Included among those are the rationales proffered by the association for its exercise of discretionary authority; the specific nature of the activity proposed by the plaintiffs; the relationship between any legitimate interests of the association and its exercise of discretionary authority; the purposes of the association and the general plan of development for the common interest community, as reflected in its governing instruments; and the extent to which discretionary authority was exercised in good faith or in an arbitrary manner.[48] In so doing, the trial court must heed our Supreme Court's "broad view of the powers delegated" to the association of a common interest community; *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 738; and remain ever cognizant of the collective interest of the common interest community. See *Dolan-King* v. *Rancho Santa Fe Assn.*, supra, 81 Cal. App. 4th 975 ("courts do not conduct a case-by-case analysis of the restrictions to determine the effect on an individual homeowner [but rather] must consider the reasonableness of the restrictions by looking at the goals and concerns of the entire development"). The court should "carefully and overtly balance the competing interests at stake, being sensitive to the purposes and fabric of the given community when taken as a whole." P. Franzese, supra, 3 Wash. U. J.L. & Policy 671.

E

Alternative Ground of Affirmance

In their appellate brief, the plaintiffs address an alternative ground of affirmance—namely, that "the green zone is a rule that was required to be adopted through the association's rule making process. . . . Because the green zone was not properly adopted by the [a]ssociation, it is invalid as a matter of law."[49] We perceive multiple problems with that contention.

It is undisputed that the plaintiffs' alternative ground never was raised before, or decided by, the trial court. See *Connecticut Ins. Guaranty Assn.* v. *Fontaine*, 278 Conn. 779, 784 n.4, 900 A.2d 18 (2006) (alternative grounds for affirmance must be raised before trial court); *New Haven* v. *Bonner*, 272 Conn. 489, 497–99, 863 A.2d 680 (2005) (declining to consider alternative ground for affirmance that was not raised before trial court). "It is fundamental that claims of error must be distinctly raised and decided in the trial court." *State* v. *Faison*, 112 Conn. App. 373, 379, 962 A.2d 860, cert. denied, 291 Conn. 903, 967 A.2d 507 (2009). Our rules of practice require a party, as a prerequisite to appellate review, to distinctly raise such claims before the trial court. See Practice Book § 5-2 ("[a]ny party intending to raise any question of law which may be the subject of an appeal must . . . state the question distinctly to the judicial authority"); see also *Remillard* v. *Remillard*, 297 Conn. 345, 351, 999 A.2d 713 (2010) (raised distinctly means party must bring to attention of trial court precise matter on which decision is being asked). As our Supreme Court has explained, "[t]he reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Internal quotation marks omitted.) *Travelers Casualty & Surety Co. of America* v. *Netherlands Ins. Co.*, 312 Conn. 714, 761–62, 95 A.3d 1031 (2014). For that reason, Connecticut appellate courts generally "will not address issues not decided by the trial court." *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 52, 717 A.2d 77 (1998); see also *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 444 n.10, 685 A.2d 670 (1996) (claims "neither addressed nor decided" by trial court are not properly before appellate tribunal).

Furthermore, the factual predicate of the plaintiffs' claim is lacking, as the record before us contains no detailed findings as to the nature of the visual buffer area referred to as the green zone and how it was adopted and implemented in Rustle Meadow. In that respect, we note that the court, in granting the plaintiffs' motion in limine, severely curtailed the defendants' ability to introduce evidence relevant to that issue. Indeed, the defendants were precluded from presenting evidence that the plaintiffs "had acknowledged in writing the need to maintain a visual green zone buffer between units for privacy and to maintain the wooded character of the community," as the minutes of the association's July 21, 2013 meeting reflect. See *New Haven* v. *Bonner*, supra, 272 Conn. 499 (declining to review alternative ground of affirmance because "factual predicate" of whether defendant received notice "is not part of this record"); cf. *McNamee* v. *Bishop Trust Co., Ltd.*, supra,

62 Haw. 407 (plaintiff unit owners "had actual notice" of association's unwritten design control criteria). Without the requisite factual findings, this court cannot engage in a meaningful review of the plaintiffs' contention. See *New Haven* v. *Bonner*, supra, 499.

We note that, in resolving the principal issue in this appeal, we have concluded that a remand to the trial court for a new trial is necessary. See parts I D 2 and 3 of this opinion. On remand, the plaintiffs are free to pursue the claim underlying their alternative ground of affirmance, at which time the parties will have an opportunity to present evidence on that issue.

## II

The defendants next contend that the court improperly ruled in favor of the plaintiffs on the defendants' counterclaim, in which they sought to recover unpaid fines issued against the plaintiffs. The defendants maintain that the court (1) improperly set aside fines imposed by the association for (a) certain landscaping violations by the plaintiffs and (b) the removal of a metal boundary marker from the corner of the plaintiffs' unit, and (2) improperly declined to render an award of attorney's fees in their favor. We address each claim in turn.

### A

We first consider the propriety of the fines levied by the association against the plaintiffs. Pursuant to General Statutes § 47-244 (a) (11), a common interest association "[m]ay impose charges or interest or both for late payment of assessments and, after notice and an opportunity to be heard, levy reasonable fines for violations of the declaration, bylaws, rules and regulations of the association . . . ." Section 25.2 (m) of Article XXV of the declaration likewise provides that the board may "[i]mpose charges or interest or both for late payment of assessments and, after [n]otice and [h]earing, levy reasonable fines for violations of this [d]eclaration, and the [b]ylaws, [r]ules and regulations of the [a]ssociation."[50] Section 2.2 (m) of the association bylaws repeats verbatim that provision of the declaration. Section 5.2 of the bylaws further provides that "following [n]otice and [h]earing, the [board] may levy a fine of up to $50 for a violation of the [d]ocuments or [r]ules and $10 per day thereafter for each day that a violation . . . persists after such [n]otice and [h]earing, but such amount shall not exceed the amount necessary to insure compliance with the rule or order of the [board]."

"To protect the financial integrity of common interest communities"; *Coach Run Condominium, Inc.* v. *Furniss*, 136 Conn. App. 698, 704, 47 A.3d 413 (2012); the act provides that an "association has a statutory lien on a unit for any assessment attributable to that unit or fines imposed against its unit owner . . . ." General

Statutes § 47-258 (a). As one Connecticut court has noted, in an action maintained by a common interest association to recover fines imposed on a unit owner, "the plaintiff has the burden of proving that the fines . . . were validly imposed . . . ." *Brookside Condominium Assn., Inc.* v. *Hargrove*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-13-6017151-S, 2013 Conn. Super. LEXIS 2706, *16 (November 26, 2013).

### 1

### Landscaping Fines

In their counterclaim, the defendants alleged that the plaintiffs violated the declaration "by removing or cutting trees, plants and shrubs, installing weed fabric and grass in the green zone and applying defoliant in that area . . . without permission of the association." The association thus assessed fines "in the amount of $10 per day," which totaled $15,530 at the time that the counterclaim was filed. In its memorandum of decision, the court analyzed the propriety of those fines as follows: "The court finds that there was no green zone by which the plaintiffs were bound and, therefore, [those] fines were illegal and inequitable." The court also found that approval for such activities "was unreasonably withheld" by the association.

Contrary to that latter finding, it is undisputed that the plaintiffs never requested permission from the association to conduct landscaping activity on their unit, as required by §§ 10.1 (k) and 13.1 (a) of the declaration. There thus is no evidence in the record to support a finding that the association withheld approval therefor.

The court predicated its decision on the notion that the green zone was illegal, which we dispelled in part I D 1 of this opinion. The court also remarked, in a one sentence footnote to its analysis, that "[m]oreover, there is insufficient evidence that it is the plaintiffs who cut trees, altered or removed foliage" on their unit. Yet the plaintiffs at trial did not disavow their involvement in that landscaping activity,[51] nor have they done so on appeal.[52] Furthermore, in accordance with its ruling on the motion in limine, the court precluded the defendants from cross-examining the plaintiffs on landscaping conducted within the green zone, stating in relevant part that "[i]f it's in the green zone, then it is irrelevant, as far as I'm concerned. . . . If you want to get into landscaping outside that fifteen foot buffer, you're free to do so, but not within the fifteen foot buffer."

The court's focus on the identity of the actors who performed the landscaping work on the plaintiffs' unit also obscures the more elemental factual issue of whether such unauthorized activity took place. Section 10.1 (k) declaration expressly requires the written consent of the association prior to the commencement of such landscaping activity on units within Rustle

Meadow. The record contains testimonial and documentary evidence depicting specific landscaping activity on the plaintiffs' unit, including photographs thereof. Consideration of that evidence is essential to a proper determination of whether the association's exercise of its authority to impose fines was warranted. Yet the court made no findings as to whether such landscaping activity transpired on the plaintiffs' unit or whether the association's decision to take enforcement action against the plaintiffs was arbitrary. See General Statutes § 47-244 (h). The court likewise did not determine whether the fines imposed by the association exceeded "the amount necessary to insure compliance with" the rules at issue, in contravention of § 5.2 of the association's bylaws. We therefore conclude that the court improperly set aside the fines assessed against the plaintiffs for unauthorized landscaping activity. The case, therefore, must be remanded for a new trial, at which the trial court shall properly consider the fines imposed by the association for any unauthorized landscaping activity in accordance with the foregoing.

2

Boundary Marker Fines

The defendants also imposed fines in the amount of $9180 for the plaintiffs' alleged removal of a metal boundary marker from a corner of their unit. In its decision, the court concluded that the defendants failed to prove that the plaintiffs removed or altered the boundary marker. It therefore concluded that those fines were improper.

The record before us substantiates that determination. At an association hearing convened to address the matter, the plaintiffs denied any involvement in the removal of the marker in question. As Duane Grovenburg testified at trial, they indicated at that hearing "that we were never aware that there was a metal stake."[53] Kristine Grovenburg similarly was asked whether she agreed with the accusation that they had removed the stake in question. She testified: "No, I do not agree with that. I—we don't even know what he's talking about. We've never seen a stake in [that] location . . . ." The court, as arbiter of credibility, was free to credit that testimony. See *Brett Stone Painting & Maintenance, LLC* v. *New England Bank*, 143 Conn. App. 671, 683, 72 A.3d 1121 (2013).

In addition, Miller acknowledged in his testimony that the association had no video, electronic, or photographic evidence of the plaintiffs interfering with or removing the marker in question. He further conceded that there was no eyewitness evidence thereof. In light of the foregoing, we agree with the trial court that the defendants failed to meet their burden of demonstrating that the fines for removing the metal boundary marker were properly imposed.

## B

We next address the court's denial of the defendants' claim for attorney's fees on the counterclaim. The defendants contend that, to the extent that they prevail on their counterclaim, such an award is warranted pursuant to General Statutes § 47-278 (a).

Section 47-278 (a) provides that "[a] declarant, association, unit owner or any other person subject to this chapter may bring an action to enforce a right granted or obligation imposed by this chapter, the declaration or the bylaws. The court may award reasonable attorney's fees and costs." Whether to award attorney's fees is a quintessential example of a matter entrusted to the sound discretion of the trial court. See, e.g., *Fairchild Heights Residents Assn., Inc.* v. *Fairchild Heights, Inc.*, 310 Conn. 797, 825, 82 A.3d 602 (2014) ("attorney's fees . . . are awarded at the discretion of the court"); *Grimm* v. *Grimm*, 276 Conn. 377, 397, 886 A.2d 391 (2005) ("[w]hether to allow counsel fees . . . and if so in what amount, calls for the exercise of judicial discretion" [internal quotation marks omitted]), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006); *Unkelbach* v. *McNary*, 244 Conn. 350, 374, 710 A.2d 717 (1998) ("[a]n abuse of discretion in granting counsel fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did" [internal quotation marks omitted]); *McHugh* v. *Niantic Dockominium Assn., Inc.*, Superior Court, judicial district of New London, Docket No. CV-04-0568170, 2005 Conn. Super. LEXIS 958, *5 (April 4, 2005) ("it is entirely within the court's discretion to award [attorney's] fees or costs" under § 47-278 [a]). The defendants in this appeal have not suggested otherwise.

In part II A 2 of this opinion, we concluded that the trial court properly determined that the defendants did not meet their burden to establish the validity of fines related to the boundary marker. They therefore cannot recover attorney's fees on that portion of the counterclaim. In part II A 1, however, we concluded that a new trial is necessary on the issue of the imposition of fines by the association for the allegedly unauthorized landscaping activity. On remand, the trial court shall first determine the propriety of those landscaping fines. Should the court rule in the defendants' favor, it then shall determine whether an award of attorney's fees on that count of the counterclaim is appropriate.

## III

The defendants also maintain that the court improperly invalidated a special assessment of the association. The following additional facts are relevant to that claim. After retaining legal counsel, the association levied a special assessment against all unit owners beginning in January, 2013. Miller testified that the special assess-

ment was issued "[t]o cover the association's legal expenses" stemming from the present controversy with the plaintiffs. At trial, the court opined that the association's decision to retain counsel at that time was "prudent." In addition, the plaintiffs introduced into evidence a document detailing their monthly payments to the association for the special assessment.

In its memorandum of decision, the court did not mention that special assessment. Although the court ruled in favor of the plaintiffs in several respects, the only relief that related to assessments of any kind was the order requiring the defendants to remove "any liens" that had been filed against the plaintiffs' unit.

Following the commencement of this appeal, the plaintiffs filed a motion for contempt with the trial court, claiming, inter alia, that the defendants had "continu[ed] to impose an assessment (i.e., a lien) on the [plaintiffs' unit] . . . ." In response, the defendants filed an objection, in which they averred that "[n]o liens had been filed. There was no evidence of any liens on [the] plaintiffs' property. No action was required by the association to comply with this directive: there was no lien to remove." In its April 6, 2015 order, the court denied the plaintiffs' motion for contempt, specifically crediting the representation of the defendants' counsel that no liens have been filed against the plaintiffs' unit. The court nonetheless ordered that "[t]he association is to remove any assessment against the plaintiffs for legal fees related to this case and any legal fees from here on in related to this case, which the court declares said fees to be null and void." The defendants thereafter filed an amended appeal with this court to encompass that additional ruling.

As a preliminary matter, we note that the act specifically addresses the allocation of common expenses[54] within a common interest community. General Statutes § 47-226 (b) requires a declaration thereof to "state the formulas used to establish allocations of interests. . . ." General Statutes § 47-257 (b), in turn, provides, with limited exceptions not germane to this appeal, that "all common expenses shall be assessed against *all the units* in accordance with the allocations set forth in the declaration . . . ." (Emphasis added.)

Article XIX of the declaration concerns the assessment and collection of common expenses. Reflecting the rather unique nature of Rustle Meadow as a common interest equine community, § 19.2 divides such expenses into three categories: (1) equestrian facility common expenses; (2) horse stall common expenses; and (3) general association common expenses. The third category is relevant to this appeal, as it includes "[a]ll other Common Expenses which are not Equestrian Facility Common Expenses or Horse Stall Common Expenses." The special assessment for legal expenses falls under that third category.

Mirroring the language of General Statutes § 47-257 (b), § 19.3 of the declaration provides that common expenses "shall be assessed against all Units in accordance with their percentage interest in such Common Expenses as shown on Schedule A-2 to this [d]eclaration." Under both the declaration and the act, then, assessments for common expenses must be apportioned equally among unit owners in accordance with their respective allocations. Furthermore, § 25.2 (c) of the declaration and § 2.2 (c) of the bylaws confer on the board the authority to "[c]ollect assessments for Common Expenses from Unit Owners . . . ." We reiterate that, in *Weldy*, our Supreme Court adopted a "broad view of the powers delegated" to a common interest association under a declaration. *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 738.

Significantly, the plaintiffs never have claimed that the association improperly imposed the special assessment or that it was apportioned in a manner contrary to the dictates of the act or the declaration. It also is undisputed that the plaintiffs paid their portion of that special assessment on a monthly basis for approximately two years, as documented in the written accounting that they introduced into evidence at trial. Moreover, the plaintiffs raised no claim regarding that special assessment in their operative complaint. Although their prayer for relief sought "[a]n order that all statutory liens arising from fines and/or penalties assessed against the plaintiffs by the association from the beginning of time to date are removed, discharged and declared null and void," the special assessment arose neither from a fine nor a penalty assessed against the plaintiffs, but rather was a common expense assessed against all unit owners in accordance with the requirements of the declaration and the act. There also is no evidence in the record before us that the association filed a statutory lien against the plaintiffs regarding that special assessment.

In its order on the plaintiffs' postjudgment motion for contempt, the court declared the special assessment "null and void" with respect to the plaintiffs. The court provided no authority to support that ruling. The plaintiffs on appeal likewise have provided this court with no authority for that action, apart from reciting the general proposition that our courts are vested with broad latitude in fashioning equitable relief. See, e.g., *Broadnax* v. *New Haven*, 270 Conn. 133, 170, 851 A.2d 1113 (2004). Even under that liberal standard, the ruling of the court cannot stand.

When a court grants equitable relief, its "ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion." (Internal quotation marks omitted.) Id. We conclude that the court's declaration that the special assessment was "null and

void" was based on an erroneous statement of law—specifically, its determination that the visual buffer zone was "illegal" because it was not memorialized in writing. See part I D 1 of this opinion. We further have concluded that the court failed to apply the proper legal standard to review the discretionary design control determinations of a common interest association, which necessitates a remand to the trial court for the proper application of that standard.[55] See parts I D 2 and 3 of this opinion. The predicate to the court's exercise of equitable relief, therefore, is lacking. Accordingly, we agree with the defendants that the court improperly declared the special assessment null and void in this case.

IV

In light of our remand for a new trial, the court's award of $72,718.25 in attorney's fees to the plaintiffs also cannot stand. As with the prior claim, the factual predicate to that award is lacking in light of our resolution of the principal issue in this appeal. See, e.g., *Absolute Plumbing & Heating, LLC* v. *Edelman*, 146 Conn. App. 383, 405, 77 A.3d 889 (noting that award of attorney's fees "must be based on findings made by the trial court" and remanding for further proceedings "to determine whether attorney's fees should be awarded and, if so, the amount of those fees"), cert. denied, 310 Conn. 960, 82 A.3d 628 (2013); *O'Brien* v. *O'Brien*, 138 Conn. App. 544, 557, 53 A.3d 1039 (2012) (award of attorney's fees "must also be remanded for reconsideration" in light of reversal and remand of underlying issues), cert. denied, 308 Conn. 937, 66 A.3d 500 (2013); *Dolan-King* v. *Rancho Santa Fe Assn.*, supra, 81 Cal. App. 4th 983–84 (concluding that association's exercise of design control power was reasonable and remanding to trial court to "determine entitlement to attorney fees"); *Gleneagle Civic Assn.* v. *Hardin*, supra, 205 P.3d 471 (remanding to trial court for determination of reasonableness of association's exercise of discretionary design control authority and holding that "the trial court's decision to award the homeowners attorney fees must also be reversed"). On remand, the trial court, in its discretion, shall determine whether an award of attorney's fees to either party is warranted following its resolution of the underlying issues. See *Total Recycling Services of Connecticut, Inc.* v. *Connecticut Oil Recycling Services, LLC*, 308 Conn. 312, 333, 63 A.3d 896 (2013) (remanding to trial court to "determine the appropriate award of attorney's fees to which the defendant is entitled"); *Woronecki* v. *Trappe*, 228 Conn. 574, 582, 637 A.2d 783 (1994) ("[a] remand . . . is necessary in order to allow the trial court the opportunity properly to exercise its discretion regarding the award of . . . attorney's fees").

The judgment is affirmed only with respect to the portion of the counterclaim pertaining to the imposition

of boundary marker fines. The judgment is otherwise reversed and the case is remanded for a new trial on the remaining issues consistent with this opinion.

In this opinion the other judges concurred.

[1] General Statutes § 47-202 (25) defines a "planned community" as "a common interest community that is not a condominium or a cooperative. A condominium or cooperative may be part of a planned community."

Section 47-202 (9) defines a "common interest community" in relevant part as "real property described in a declaration with respect to which a person, by virtue of his ownership of a unit, is obligated to pay for a share of (A) real property taxes on, (B) insurance premiums on, (C) maintenance of, (D) improvement of, or (E) services or other expenses related to, common elements, other units or any other real property other than that unit described in the declaration. . . ."

Section 2.1 of Article II of the Declaration of Rustle Meadow states that "Rustle Meadow is a planned community."

[2] "The act is a comprehensive legislative scheme regulating all forms of common interest ownership that is largely modeled on the Uniform Common Interest Ownership Act. . . . The act addresses the creation, organization and management of common interest communities and contemplates the voluntary participation of the owners. It entails the drafting and filing of a declaration describing the location and configuration of the real property, development rights, and restrictions on its use, occupancy and alienation . . . the enactment of bylaws . . . the establishment of a unit owners' association . . . and an executive board to act on . . . behalf [of the association]. . . . It anticipates group decision-making relating to the development of a budget, the maintenance and repair of the common elements, the placement of insurance, and the provision for common expenses and common liabilities." (Citations omitted; internal quotation marks omitted.) *Weldy* v. *Northbrook Condominium Assn.*, *Inc.*, supra, 279 Conn. 735. As one commentator observed, "[t]he common interest community closely approximates in many ways a small municipal government as it maintains private streets and parks, provides homeowner security, and collects homeowner assessments for the purpose of financing the aforesaid activities." D. Callies, "Common Interest Communities: An Introduction," 37 Urb. Law. 325, 326 (2005).

[3] The declaration survey was admitted into evidence as exhibit TTT. A copy of that document is included in the declaration as Schedule A-1 (i).

[4] See General Statutes § 47-264 et seq.

[5] Pursuant to § 8.10 of Article VIII of the declaration, the company was vested with exclusive control of the association for a preliminary period of Rustle Meadow's existence. Section 8.10 (a) provides in relevant part that "[t]he period of Declarant control shall terminate no later than the earlier of: (i) Sixty (60) days after conveyance of sixty percent (60%) of the Units that may be created to Unit Owners other than a Declarant; (ii) Two (2) years after all Declarants have ceased to offer Units for sale in the ordinary course of business; or (iii) Two (2) years after any right to add new Units was last exercised."

The first criterion was not satisfied, as the court found that only two of the seven units had been conveyed at the time of trial. At trial, the court made no findings with respect to the latter two criteria, though it did note that "[t]he remaining lots of the development have not yet been sold or transferred . . . ." Precisely when the company's control of the association under § 8.10 terminated is a factual issue that was not resolved by the trier of fact. Nonetheless, the court in its memorandum of decision found that it was the association that denied the plaintiffs' fence proposal and imposed fines on the plaintiffs for certain activities. Neither party disputes that determination in this appeal.

[6] Article VI of the association's bylaws provides for the indemnification of its directors and officers.

[7] "A restrictive covenant is a servitude, commonly referred to as a negative easement . . . ." (Citations omitted.) *Hawthorne* v. *Realty Syndicate*, *Inc.*, 43 N.C. App. 436, 440, 259 S.E.2d 591 (1979), aff'd, 300 N.C. 660, 268 S.E.2d 494 (1980). "A servitude is a legal device that creates a right or an obligation that runs with the land or an interest in land." 1 Restatement (Third), Property, Servitudes § 1.1 (1), p. 8 (2000).

[8] The plaintiffs' parcel measures 134.92 feet in width at its westerly border; its northeasterly border contains approximately 150 feet of frontage on Rustle Meadow Lane. The parcel's northwesterly side border is 500.81 feet,

while its southeasterly side border is 665.42 feet. That parcel is the narrowest one in Rustle Meadow.

[9] The declaration survey indicates that approximately one-third of the plaintiffs' parcel is subject to the pasture easement. At trial, Miller described the pasture easement as "an area . . . to pasture horses."

[10] The reservation of such developmental rights is recognized in § 8.1 of Article VIII of the declaration. Pursuant to § 8.1 (a), the company reserved "[t]he right to create Units . . . Common Elements, and Limited Common Elements within the Common Interest Community . . . . Any real property within which the Declarant may create Units, Common Elements and Limited Common Elements shall be designated 'Development Rights Reserved in this Area' on the Survey." The area on the declaration survey depicting the pasture easement bears that designation. The deed expressly indicates that the plaintiffs acquired Unit 3 subject to "[t]hose matters shown on Schedule A-1" of the declaration.

[11] There is no indication in the record that the plaintiffs requested permission to install a fence at that time. Rather, Kristine Grovenburg testified at trial that they did so sometime after the pool was constructed.

[12] That proposal stated in relevant part: "Details are as follows: [1] Installed by Cape Code Fence Company . . . [2] Color for three sides of the fence is black aluminum . . . [3] The side of the fence along the woods [adjacent to the southeasterly property line] is to be wood post and black pool wire required for code. The wood post[s] are natural wood. This is done so that this side of the fence blends in more naturally with the landscaping and existing trees . . . [4] A sample section of the Echelon fence product can be seen at Cape Code Fence."

[13] Miller's June 25, 2010 e-mail to the plaintiffs stated: "The board received your request for approval of a pool fence, and needs the following materials to render an approval: [1] Photographs or brochures of the proposed materials for review. [2] A drawing that is to scale. This drawing should show the patio, fence, green zone and property lines, [and] distance of the proposed fence from the patio and from the [fifteen] foot green zone line. [3] A description of the equipment used to install the posts, and a construction plan describing how all equipment will be used to access the site and where materials will be stored, and all workmen be kept out of the green zone. The area between the green zone and the [e]ast side of the pool is narrow and has many obstructions, consequently careful planning is important. [4] A post construction review to determine that construction was as approved. Thank you for submitting the request. I have copied your attorney on this as you requested. There is no need or authorization at this time to engage any of our attorneys on this matter, or any other matter of the [association]. This is a normal function of the association, and our attorneys have been directed to forward any such communications back to the association."

[14] Although § 13.1 (b) of Article XIII of the declaration directs the board to act on requests for approval made pursuant to §§ 10.1 (k) and 13.1 (a) (ii) within sixty days, it further provides that the "[f]ailure to do [so] within such time shall not constitute consent by the [board] to the proposed action."

[15] General Statutes § 47-278 (a) provides: "A declarant, association, unit owner or any other person subject to this chapter may bring an action to enforce a right granted or obligation imposed by this chapter, the declaration or the bylaws. The court may award reasonable attorney's fees and costs."

[16] General Statutes § 52-504 provides: "When any action is brought to or pending in the superior court in which an application is made for the appointment of a receiver, any judge of the superior court, when such court is not in session, after due notice given, may make such order in the action as the exigencies of the case may require, and may, from time to time, rescind and modify any such order. The judge shall cause his proceedings to be certified to the court in which the action may be pending, at its next session."

[17] When the plaintiffs commenced this action in 2013, they also filed an application for a temporary injunction, which largely mirrors the prayer for relief contained in their complaint. There is no indication in the record that this application was acted upon, nor is there any mention of that application by the parties in their respective appellate briefs.

[18] Although the court repeatedly branded the injunction as "temporary" in nature, this court has held that "[m]erely calling an order a temporary injunction, however, does not determine its appealability. Our function is to examine the trial court's order and determine whether, because of its form or content, it is in fact a permanent injunction and thus appealable." *Stamford* v. *Kovac*, 29 Conn. App. 105, 109, 612 A.2d 1229 (1992), rev'd on

other grounds, 228 Conn. 95, 634 A.2d 897 (1993).

[19] The $72,718.25 figure represented the $57,718.25 award of attorney's fees to the plaintiffs, which the court augmented by an additional $15,000 at the behest of the plaintiffs for costs that they anticipated incurring in this appeal.

[20] General Statutes § 52-477 provides: "When judgment has been rendered for a permanent injunction ordering either party to perform any act, the court, upon an application similar to that mentioned in section 52-476, shall stay the operation of such injunction until a final decision in the court having jurisdiction, unless the court is of the opinion that great and irreparable injury will be done by such stay or that such application was made only for delay and not in good faith."

[21] Owners, of course, also obtain the benefit of the community's common elements. *Wilcox* v. *Willard Shopping Center Associates*, supra, 208 Conn. 326.

[22] That treatise states in relevant part: "The general principles governing servitude interpretation . . . adopt the model of interpretation used in contract law and displace the older interpretive model used in servitudes law that emphasized the free use of land, sometimes at the expense of frustrating intent. In adopting this model, this Restatement follows the lead of courts that have recognized the important and useful role servitudes play in modern real-estate development. To the extent that the old canon favoring free use of land remains useful, its function is served in cautioning against finding that a servitude has been created where the parties' intent is unclear . . . and in construing servitudes to avoid violating public policy . . . . It also may play a role in limiting the creation of servitudes that burden fundamental rights . . . and limiting the rulemaking powers of community associations . . . . Aside from those situations, construing in favor of free use of land should play no role in interpreting modern servitudes." 1 Restatement (Third), Property, Servitudes c. 4, introductory note, pp. 494–95 (2000).

[23] A minority of jurisdictions have adopted the business judgment rule with respect to the exercise of discretionary association determinations. See footnote 24 of this opinion.

[24] A minority of jurisdictions have adopted the business judgment rule to govern review of discretionary association action. See, e.g., *Reiner* v. *Ehrlich*, 212 Md. App. 142, 155, 66 A.3d 1132, cert. denied, 433 Md. 514, 72 A.3d 173 (2013); *Levandusky* v. *One Fifth Avenue Apartment Corp.*, supra, 75 N.Y.2d 537; *Lyman* v. *Boonin*, 535 Pa. 397, 402–404, 635 A.2d 1029 (1993). The business judgment rule is even *more* deferential to association action than the reasonableness standard, which itself is a deferential one; see *Cape May Harbor Village & Yacht Club Assn., Inc.* v. *Sbraga*, supra, 421 N.J. Super. 65 (contrasting business judgment rule with "the less deferential reasonableness standard"); as the business judgment rule requires proof of "the presence of fraud or lack of good faith in the conduct of a corporation's internal affairs before the decisions of a board of directors can be questioned." *Papalexiou* v. *Tower West Condominium*, 167 N.J. Super. 516, 527, 401 A.2d 280 (1979). For that reason, the Restatement declined to adopt that lax standard. The commentary to § 6.13 explains that "[t]he business-judgment rule [was] not adopted because the fit between community associations and other types of corporations is not very close, and it provides too little protection against careless or risky management of community property and financial affairs." 2 Restatement (Third), Property, Servitudes § 6.13, comment (b), pp. 236–37 (2000).

We note that, under the act, association rule making in Connecticut expressly is governed by a reasonableness standard. See General Statutes § 47-261b (h). In addition, our Supreme Court in *Weldy*, as discussed in part I B of this opinion, set forth a two part test that entails consideration of whether an association's exercise of discretionary authority under a declaration was reasonable. *Weldy* v. *Northbrook Condominium Assn., Inc.*, supra, 279 Conn. 734. In light of the foregoing, we agree with the Restatement that the business judgment rule is not the preferable standard to govern judicial review of discretionary association decisionmaking in common interest communities in Connecticut. Rather, for the reasons discussed throughout part I of this opinion, we conclude that the reasonableness standard better protects the interests of both the unit owner and the common interest community.

[25] On many occasions, our Supreme Court has distinguished matters that are " 'reasonable, rather than arbitrary or capricious' "; *State* v. *Jason B.*, 248 Conn. 543, 560, 729 A.2d 760, cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d 316 (1999); *State* v. *Matos*, 240 Conn. 743, 749, 694 A.2d 775

(1997); cf. *State* v. *Hodge*, 153 Conn. 564, 570, 219 A.2d 367 (1966) (contrasting "reasonable" delays in right to speedy trial with ones that are arbitrary or capricious); *Barr* v. *First Taxing District*, 151 Conn. 53, 59, 192 A.2d 872 (1963) (contrasting "reasonable" exercise of discretion from that which is "arbitrary"); accord *Leonard* v. *Stoebling*, 102 Nev. 543, 549, 728 P.2d 1358 (1986) (determinations of architectural control committee "not arbitrary if they were reasonable and were in good faith").

We also note that the two part test memorialized in *Weldy* was applied in our Superior Court one decade earlier. In *Townhouse III Condominium Assn.*, *Inc.* v. *Mulligan*, Superior Court, judicial district of Tolland, Docket No. CV-92-50183-S (March 13, 1995) (*Klaczak, J.*) (14 Conn. L. Rptr. 112, 113), the court noted that "[i]n determining the validity of condominium rules and regulations, courts have developed a 'reasonableness' test. The first prong of the test is whether the board acted within the scope of its authority. The second prong is whether the rule reflects reasoned or arbitrary and capricious decision making."

[26] Section 10.1 (k) of Article X of the declaration provides in relevant part: "No building, shed, swimming pool, pavement, *fence*, wall or other structure or improvement of any nature shall be erected upon any Unit in the Common Interest Community without the prior written consent of the Declarant . . . . No Unit Owner shall make any exterior addition, change or alteration to a Unit or any residence located therein . . . or substantially change the topography of a Unit including the removal of any trees without the prior written consent of the Declarant which consent shall not be unreasonably withheld. Detailed plans of any such construction or landscaping or any addition, change or alteration thereto shall be submitted to the Declarant . . . . The Unit Owner must receive written approval from the Declarant prior to commencing such construction, landscaping or making any additions, changes or alterations. Any unauthorized construction or changes must be restored to its previous condition at such Unit Owner's expense." (Emphasis added.)

Section 13.1 (a) (ii) of Article XIII of the declaration similarly provides that a unit owner "[m]ay not make any changes, additions, alterations, or improvements to any structure in or on any Unit or to the Common Elements or make any substantial change to the topography of a Unit or the Common Elements including the removal of trees, without the prior written approval of the Declarant as provided in Section 10.1 (k) of this Declaration or of the [a]ssociation as provided therein, as well as receiving all necessary governmental permits and approvals. Such approval by the Declarant or the [a]ssociation shall not be unreasonably withheld."

[27] At trial, Kristine Grovenburg acknowledged that the association had discretion to approve all exterior changes to her unit pursuant to the declaration and that she was required to obtain its permission prior to making any such alterations or improvements.

[28] See, e.g., *Rymer* v. *Polo Golf & Country Club Homeowners Assn.*, *Inc.*, 335 Ga. App. 167, 175, 780 S.E.2d 95 (2015) (trial court cannot substitute own judgment for that of association when restrictive covenants confer discretion on association); *Noble* v. *Murphy*, 34 Mass. App. 452, 456, 612 N.E.2d 266 (1993) ("[c]lose judicial scrutiny and possible invalidation or limitation of fundamentally proper but broadly drawn use restrictions . . . would deny to developers and unit owners the 'planning flexibility' inherent in" statutory scheme); *Griffin* v. *Tall Timbers Development, Inc.*, 681 So. 2d 546, 553–54 (Miss. 1996) (trial court may not substitute own judgment for association in applying reasonableness standard); *Preserve Homeowners' Assn.*, *Inc.* v. *Zhan*, 117 App. Div. 3d 1398, 1399, 984 N.Y.S.2d 743 (courts will not substitute judgment so long as association board acts for purpose of common interest community, within scope of its authority and in good faith), appeal dismissed, 24 N.Y.3d 932, 17 N.E.3d 1140, 993 N.Y.S.2d 543 (2014); *Palmetto Dunes Resort* v. *Brown*, 287 S.C. 1, 7, 336 S.E.2d 15 (App. 1985) ("although people may reasonably differ as to [a discretionary design control determination], the covenant is unambiguous in leaving this solitary judgment to" the association).

[29] Accord, e.g., *Tierra Ranchos Homeowners Assn.* v. *Kitchukov*, supra, 216 Ariz. 202 (property owner challenging association determination bears burden of establishing "that its actions were unreasonable"); *Dolan-King* v. *Rancho Santa Fe Assn.*, 81 Cal. App. 4th 965, 979, 97 Cal. Rptr. 2d 280 (2000) ("[h]aving sought a declaration that the [association's review board] imposed restrictions unreasonably and arbitrarily, it was [the plaintiff property owner's] burden at trial to make that showing before the trial court"), review denied, 2000 Cal. LEXIS 7972 (Cal. October 3, 2000); *Uptegraph* v.

*Sandalwood Civic Club*, 312 S.W.3d 918, 933 (Tex. App. 2010) (property owner had "burden at trial to prove that [the association's] exercise of its discretionary authority was arbitrary, capricious, or discriminatory").

[30] See, e.g., *Statewide Grievance Committee* v. *Ganim*, 311 Conn. 430, 451, 87 A.3d 1078 (2014) (burden is on applicant in reinstatement proceeding to establish that standing committee acted arbitrarily or in abuse of its discretion in approving or withholding its approval); *Moraski* v. *Connecticut Board of Examiners of Embalmers & Funeral Directors*, 291 Conn. 242, 258–60, 967 A.2d 1199 (2009) (applying abuse of discretion standard to administrative agency's decision to permit Department of Public Health to amend its statement of charges filed against licensed embalmer and funeral home and holding that plaintiff challenging agency determination bore burden of proof); *Conley* v. *Board of Education*, 143 Conn. 488, 498, 123 A.2d 747 (1956) (plaintiff challenging board's determination bears burden of proof when "[t]he question for the court . . . is whether the board, in reaching its conclusions and taking the action challenged, acted illegally or in abuse of the discretion"); *Mallory* v. *West Hartford*, 138 Conn. 497, 505, 86 A.2d 668 (1952) ("[t]he burden of proof was on the plaintiffs" because "[t]he basic allegation of the plaintiffs was that the council acted arbitrarily, illegally, unreasonably, without authority and in abuse of its discretion"); *Gevers* v. *Planning & Zoning Commission*, 94 Conn. App. 478, 483, 892 A.2d 979 (2006) (in light of deferential standard of review, "[t]he plaintiffs shoulder the burden of demonstrating that the commission acted improperly").

[31] See, e.g., *Tierra Ranchos Homeowners Assn.* v. *Kitchukov*, supra, 216 Ariz. 202; *Gleneagle Civic Assn.* v. *Hardin*, supra, 205 P.3d 470; *Trieweiler* v. *Spicher*, 254 Mont. 321, 327, 838 P.2d 382 (1992); *Cypress Gardens, Ltd.* v. *Platt*, supra, 124 N.M. 478; 2 Restatement (Third), Property, Servitudes § 6.9, comment (d), p. 174 (2000) ("[d]etermining whether design-control powers have been unreasonably exercised requires a fact-specific, case-by-case inquiry").

[32] See footnote 26 of this opinion.

[33] Although they argue in their appellate brief that the court properly "determined that the green zone was unlawful because it was not in writing," the plaintiffs acknowledge that the court did not "articulate the legal basis for the green zone having to be in writing . . . ."

[34] In the zoning context, our Supreme Court has observed that "[i]t must be borne in mind . . . that we are dealing with a group of [lay people] who may not always express themselves with the nicety of a Philadelphia lawyer. Courts must be scrupulous not to hamper the legitimate activities of civic administrative boards . . . ." *Couch* v. *Zoning Commission*, 141 Conn. 349, 358, 106 A.2d 173 (1954). That logic applies equally to members of common interest associations. When considering the reasonableness of its discretionary determination, the focus properly is on the action of the association and the rationale therefor, rather than the particular nomenclature employed by that body of lay people.

[35] See, e.g., *Dolan-King* v. *Rancho Santa Fe Assn.*, supra, 81 Cal. App. 4th 977 ("California and many other jurisdictions have long upheld such general covenants vesting broad discretion in homeowners associations or boards to grant or withhold consent to construction. . . . This is so even when the covenants contain such broad, general approval standards . . . ." [citations omitted]); *Rhue* v. *Cheyenne Homes, Inc.*, supra, 168 Colo. 8 (rejecting claim that restrictive covenant "is not enforceable because no specific standards are contained therein to guide the committee in determining the approval or disapproval of plans when submitted"); *Donoghue* v. *Prynnwood Corp.*, 356 Mass. 703, 707, 255 N.E.2d 326 (1970) (restriction requiring approval of plans that lack explicit standards of approval "may be enforced if the power to do so is exercised reasonably"); *LeBlanc* v. *Webster*, supra, 483 S.W.2d 649 (rejecting claim that "unless an external standard for the exercise of the right of approval is provided such a right of approval is vague, indefinite and unenforceable"); *Syrian Antiochian Orthodox Archdiocese of New York & All North America* v. *Palisades Associates*, 110 N.J. Super. 34, 40–41, 264 A.2d 257 (Ch. Div. 1970) (noting that "[t]he most commonly voiced criticism of such [a restrictive covenant] is that it is vague, fixes no standards and hence affords the grantor an opportunity to be capricious, unfair and arbitrary" and recognizing that "such covenants have been very generally sustained" although subject to requirement that "any disapproval must be reasonable and made in good faith"); *Smith* v. *Butler Mountain Estates Property Owners Assn., Inc.*, 90 N.C. App. 40, 48, 367 S.E.2d 401 (1988) (covenants requiring prior approval of plans valid "even if vesting the approving authority with broad discretionary power" and "even in the absence of

specific approval standards in the covenants . . . so long as the authority to consent is exercised reasonably and in good faith"), aff'd, 324 N.C. 80, 375 S.E.2d 905 (1989); *Dodge* v. *Carauna*, supra, 127 Wis. 2d 65–66 (lack of "express standards for approval" in restrictive covenant does not render it unclear, ambiguous, or unenforceable).

[36] See, e.g., *Rhue* v. *Cheyenne Homes, Inc.*, supra, 168 Colo. 9; *McNamee* v. *Bishop Trust Co., Ltd.*, supra, 62 Haw. 407; *LeBlanc* v. *Webster*, supra, 483 S.W.2d 650; *Cypress Gardens, Ltd.* v. *Platt*, supra, 124 N.M. 478.

[37] We note that, at oral argument before this court, the plaintiffs were asked what would constitute a proper basis for the association to exercise its discretion under § 10.1 (k) of the declaration to deny a proposed activity. In response, the plaintiffs' counsel stated that "safety concerns" could be a proper basis. There is no mention of safety concerns in § 10.1 (k).

[38] We note that, in addition to providing the court with a copy of the *Weldy* decision at the outset of trial, counsel for the defendants argued that *Weldy* was "the only . . . Supreme Court case on point." Throughout trial, counsel repeatedly relied on *Weldy* as binding authority on the ultimate issue before the court. As but one example, during his cross-examination of Kristine Grovenburg, counsel inquired as to "one of . . . the features along the [southeasterly] side between . . . your house and the [abutting] neighbors was to have a forested area that would provide some privacy between the homes." At that time, the plaintiffs' counsel objected, and discussion ensued as to whether that line of questioning was improper in light of the court's granting of the motion in limine. Counsel for the defendants argued in relevant part that "the declaration is an agreement, Your Honor, and . . . ultimately the Supreme Court says the [trial] court has to decide whether the decisions are arbitrary or reasonable, and that whole issue of reasonableness goes to the landscaping from the beginning [of the common interest community] to the present time . . . ." The court sustained the plaintiffs' objection and precluded such testimony on the privacy provided by the wooded area between the units, stating that "[i]f it's in the green zone, then it is irrelevant, as far as I'm concerned."

[39] Cases such as *Leonard* v. *Stoebling*, supra, 102 Nev. 543, are illustrative in this regard. In finding the exercise of discretionary design control power unreasonable, the Supreme Court of Nevada held that the committee responsible for exercising such authority "gave no heed to the impact" of the proposed activity on neighboring properties. Id., 549. The Supreme Court of Washington similarly found unreasonable the actions of a board that failed to "reasonably assess the impact" of a proposed activity, "much less with an eye to neighbors' views or privacy." *Riss* v. *Angel*, supra, 131 Wn. 2d 628; see also *Dolan-King* v. *Rancho Santa Fe Assn.*, supra, 81 Cal. App. 4th 976, 982 (noting that "[m]aintaining a consistent and harmonious neighborhood character . . . confers a benefit on the homeowners by maintaining the value of their properties" and holding that the trial court improperly "made no finding as to the 'rural character' [of the] neighborhood"); *McNamee* v. *Bishop Trust Co., Ltd.*, supra, 62 Haw. 408 (privacy among unit owners "was a reasonable consideration" in exercising design control discretion); *Melson* v. *Guilfoy*, supra, 595 S.W.2d 407 (finding "no abuse of discretion" in discretionary determination to disapprove pool fence even when no " 'external standard' " set forth in declaration and noting that restrictive covenants in question were upheld "to maintain a park-like residential community"); *Gosnay* v. *Big Sky Owners Assn.*, 205 Mont. 221, 227, 666 P.2d 1247 (1983) (association board "did not abuse its discretion when it refused . . . permission to build [a proposed] fence" because proposal "is contrary to [the common interest community's] overall plan for 'openness' "); *River Hills Property Owners Assn., Inc.* v. *Amato*, 326 S.C. 255, 260, 487 S.E.2d 179 (1997) (association board acted reasonably and in good faith in denying approval for pool fence that "would reduce the view" of abutting property). At the very least, such cases shed light on the rationale proffered by the association in the present case. Nevertheless, we repeat that the factual issue of reasonableness involves a weighing analysis that entails consideration of "all the relevant circumstances" and factors in a given case. *Peterson* v. *Oxford*, supra, 189 Conn. 745.

[40] The only reference to the plaintiffs' proposal in the memorandum of decision is the court's finding that the plaintiffs sought "permission from the association to put a fence around the swimming pool, as required by the town of Canton . . . ."

[41] In their February 3, 2015 motion for reconsideration, the defendants requested reargument and reconsideration due to the fact that the plaintiffs at trial "never articulated a reason for their preferred placement of the fence

to either [the] defendants or the court, some need that the [a]ssociation could balance against its privacy concerns. . . . The [a]ssociation could never balance the needs of the community against the [plaintiffs'] needs because they never specified the reasons for their plans." (Citations omitted.) The court denied that motion.

[42] In the "Reply to Defendants' Posttrial Memorandum" that the plaintiffs submitted to the court, the plaintiffs appear to concede the location of that septic system, stating in relevant part that "the fact that a septic system is in the green zone is irrelevant . . . ." When questioned on this point at oral argument before this court, the plaintiffs' counsel likewise acknowledged that the septic system was located in the green zone, but argued that "the septic system is different."

[43] In their appellate brief, the plaintiffs do not acknowledge their July 27, 2008 written statement to Miller. Rather, they argue that when the association denied their fencing proposal in 2010, "[i]t is obvious that Miller blindsided the plaintiffs with the green zone, in bad faith . . . because he never previously informed the plaintiffs of the restriction . . . ."

[44] The record also indicates that those settlement discussions continued after the commencement of this appeal. Months after the defendants filed their appeal, the plaintiffs filed a motion for an extension of time to file their appellate brief. In that pleading, they represented to this court that "the parties are continuing substantive settlement discussion relating to the heart of the legal and factual issues in this case . . . . [A] settlement agreement in this case will involve the preparation of a detailed landscaping plan, with specified plantings in designated areas of the [plaintiffs'] property, among other things. The parties have been working together to formulate the landscaping plan for months, with the assistance of a professional landscaper."

[45] Moreover, we note that, in his December 28, 2011 letter to the Canton building department, Miller did not state that the plaintiffs' original fence proposal was denied because it was located in the green zone. Rather, he indicated that it was denied because "the plan that was submitted placed the fence unnecessarily within a [fifteen] foot visual buffer zone," suggesting that a showing of necessity may have yielded a different result.

[46] For that reason, this court cannot, as the defendants urged at oral argument, decide the question of reasonableness and direct the trial court to render judgment in their favor.

[47] In their respective appellate briefs, neither party has suggested that the general preponderance of the evidence standard applies in this case.

[48] With respect to this last consideration, we note that the court stated, in a subsequent part of its memorandum of decision addressing landscaping restrictions, that "Miller trimmed trees in front of his house and removed trees in the so-called green zone, and did not ask permission from the association. He set one standard for himself and another standard for the plaintiffs." The court made no further findings in this regard.

Those findings are troublesome for two distinct reasons. First, there is no evidence in the record to substantiate the court's finding that Miller "removed trees in the so-called green zone . . . ." On cross-examination, he was asked if he had "ever cut or trimmed any branches in your yard?" Miller answered that he "did trim some of the ash trees in the center of the front yard." No question was asked, and no testimony was elicited, on whether those ash trees were located in the green zone. That finding, therefore, is clearly erroneous. See *Wheelabrator Bridgeport*, *L.P.* v. *Bridgeport*, 320 Conn. 332, 364, 133 A.3d 402 (2016).

Furthermore, even assuming that the ash trees were located in the green zone, the court's suggestion that Miller failed to follow association protocols ignores the fact that, under the plain language of § 8.10 of Article VIII of the declaration, the company was vested with exclusive control of the association for a preliminary period of Rustle Meadow's existence, which obviated the need for Miller, the sole member of the company, to seek approval to conduct such activity. As we already have noted, the trial court failed to make any factual findings as to when the company's control under § 8.10 terminated. See footnote 5 of this opinion. Without any findings as to precisely where the trees in question were located, when Miller trimmed those trees, and when the company's control under the declaration terminated, such evidence was not relevant to the reasonableness analysis.

At the same time, the trial court's findings suggest that the court was concerned about whether Miller and the association acted in good faith in regulating landscaping activity within the green zone area. On remand, if evidence is adduced at the new trial indicating that landscaping activity

was conducted within the green zone area on any other unit within Rustle Meadow—including that belonging to Welles—the finder of fact could conclude that the association's discretionary determinations with respect to such activity on the plaintiffs' unit were arbitrary and made in bad faith. See, e.g., *White Egret Condominium, Inc.* v. *Franklin*, supra, 379 So. 2d 352 (finding that use restriction in common interest association "was reasonably related to a lawful objective" but nonetheless "was selectively and arbitrarily applied").

[49] We note that, under our rules of practice, an appellee who wants to present an alternative ground on which to affirm a trial court's judgment is required to file a preliminary statement of issues intended for presentation on appeal. Practice Book § 63-4 (a) (1) (A). Our rules further require that such a filing must be filed "within twenty days from the filing of the appellant's preliminary statement of the issues." Practice Book § 63-4 (a) (1) (C). The plaintiffs have not complied with those requirements in this case.

[50] There is no claim in the present case that the association failed to comply with the notice and hearing requirements of the declaration and General Statutes § 47-244 (d) (2). Contra *Congress Street Condominium Assn., Inc.* v. *Anderson*, 156 Conn. App. 117, 112 A.3d 196 (2015); *Stamford Landing Condominium Assn., Inc.* v. *Lerman*, 109 Conn. App. 261, 951 A.2d 642, cert. denied, 289 Conn. 938, 958 A.2d 1246 (2008).

[51] The plaintiffs did not deny their involvement during their direct examination testimony. To the contrary, their attorney at trial maintained that the plaintiffs had "been fined *because they intruded on and they did things* in an area that they were not supposed to even touch because there's a restriction, as Mr. Miller claims, that this area, this buffer zone, can't be touched, can't be used." (Emphasis added.)

[52] Rather than disavowing their involvement in the landscaping activity in question, the plaintiffs in their appellate brief submit that, because the trial court correctly determined that the green zone was invalid, it properly set aside the association's fines for unauthorized landscaping activity. Their briefing of this issue states: "Miller testified that all the fines for landscaping violations were assessed because of landscaping performed by the plaintiffs in the green zone, without permission. However, it would have been futile for the plaintiffs to request permission to perform landscaping activity in the green zone as the request would have been denied since that area is completely off limits. . . . [T]he trial court properly concluded that the green zone was invalid, and therefore the fines cannot stand." (Citation omitted.)

[53] On cross-examination, the following exchange ensued:

"[The Defendants' Attorney]: It's just a complete mystery to you. Is that what you're telling the court, Mr. Grovenburg?

"[Duane Grovenburg]: I'm saying I'm not aware of a metal stake.

"[The Defendants' Attorney]: You're not aware of a metal stake.

"[Duane Grovenburg]: No.

"[The Defendants' Attorney]: You're not aware of a metal stake being pulled out of the ground?

"[Duane Grovenburg]: No, I'm not."

[54] "Common expenses" are defined in the act as "expenditures made by, or financial liabilities of, the association, together with any allocations to reserves." General Statutes § 47-202 (7).

[55] On remand, the trier of fact may conclude that the association's failure to approve the plaintiffs' revised fencing proposal was reasonable and appropriate under the particular circumstances of this case.